No. 18-3096
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____


**CAROLYN HANS,**

**Plaintiff/Appellant,**

**v.**

**BOARD OF SHAWNEE COUNTY, et al.,**

**Defendants/Appellees.**


_____

**Appeal from the United States District Court
For the District of Kansas
Honorable Daniel D. Crabtree, United States District Judge
District Court Case No. 16-4117-DDC**
_____


**BRIEF OF APPELLANT**


Jennifer M. Hill, #21213
MCDONALD TINKER PA
300 W. Douglas, Suite 500
Wichita, KS 67202
Phone: (316) 263-5851
Fax:    (316) 263-4677
Email:  jhill@mcdonaldtinker.com
*Attorney for Plaintiff/Appellant*

**Oral Argument Is Requested**

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES ON APPEAL .........................................................................1

STATEMENT OF THE CASE................................................................2

SUMMARY OF PLAINTIFF'S ARGUMENTS ....................................13

PLAINTIFF'S ARGUMENTS AND AUTHORITIES...........................15

I.    MATERIAL FACTS REMAIN CONTROVERTED AND THE DISTRICT
COURT FAILED TO ADDRESS THE ENTIRETY OF THE RECORD..............15

    A.    Standard of Review...................................................15

    B.    Material Facts Remain in Dispute Precluding Summary
Judgment ...................................................................16

II.    THE DEPUTIES DID NOT HAVE PROBABLE CAUSE TO ARREST MS.
HANS AND THE DISTRICT COURT'S ANALYSIS ON THIS ISSUE
FAILED TO ADDRESS THE DEPUTIES' SPECIFIC TESTIMONY ON
THE ISSUE .............................................................................19

    A.    Standard of Review...................................................19

    B.    The Deputies in This Case Testified They Arrested Ms.
Hans Based on Her "Admission" to a Crime, Not on the
"Totality of the Circumstances"................................19

III.    THE DISTRICT COURT'S DETERMINATION THAT PLAINTIFF MUST
SHOW INTENTIONAL DISCRIMINATION TO RECOVER
COMPENSATORY DAMAGES UNDER TITLE II IS CONTRARY TO
THE ENTIRE OBJECTIVE OF THE AMERICANS WITH DISABILITIES
ACT .....................................................................................29

    A.    Standard of Review...................................................29

B.    The Americans with Disabilities Act Was Passed to Protect Disabled Citizens from "Benign Neglect" and Not Simply Intentional Discrimination.....................................29

IV.    PLAINTIFF'S STATE LAW CLAIMS SHOULD BE PRESERVED FOR A JURY'S CONSIDERATION .........................................................................36

A.    Standard of Review ........................................................................36

B.    Plaintiff's Kansas Law Claims Are Well Supported by the Record Before the Court ........................................................37

1.    False Arrest ......................................................................37

2.    Negligent Training...........................................................38

3.    Intentional Infliction of Emotional Distress ..................41

CONCLUSION ....................................................................................................42

REQUEST FOR ORAL ARGUMENT ...............................................................43

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................44

CERTIFICATE OF DIGITAL SUBMISSION ....................................................44

CERTIFICATE OF SERVICE .............................................................................45

ATTACHMENTS:

A    Memorandum and Order [Doc 79]

B    Judgment in a Civil Action [Doc 80]

# TABLE OF AUTHORITIES

## Statutes

K.S.A. § 21-5414(2)................................................................24

Kan. Stat. Ann.  § 21-5414(2) (2015) ....................................24

K.S.A. § 21-5222 ...................................................................27

## Cases

*Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901,
907 (2004) .............................................................................34

*Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)...........32

*BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986)................................25

*Commerce Bank of St. Joseph, N.A. v. State of Kansas*, 251 Kan. 207,
833 P.2d 996 (Kan. 1992) .......................................................41

*Cortez v. McCauley*, 478 F.3d 1108, 1117-1123 (2007) .......................25, 26, 27, 28

*Estate of Belden v. Brown Cnty*, 46 Kan. App. 2d 247, 283,
261 P.3d 943, 968 (2011).........................................................38

*Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995) ...........................................33

*Kimzey v. Flamingo Seismic Solutions, Inc.,* 696 F.3d 1045, 1048
(10th Cir. 2012).......................................................................19, 29, 37

*Marquis v. State Farm Fire & Cas. Co.,* 265 Kan. 317, 334-35,
961 P.2d 1213 (1998)...............................................................38

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312-1313 (10th Cir. 2002) ..........16, 17

*Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) ....................................20

*Pushkin v. Regents of University of Colorado*, 658 F.2d at 1372
(10th Cir. 1981) ............................................................................................34, 35

*Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995)...............................................25

*Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013)............16

*Tyler v. City of Manhattan,* 118. F.3d at 1407-08 ......................................30, 31, 32

*Washington v. Indiana High School Athletic Ass'n, Inc.*, 181 F.3d 840
(7th Cir. 1999) ...............................................................................................33, 34

*Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) ...............15

*Williams v. Owners Ins. Co.,* 621 F. App'x 914, 917–18 (10th Cir. 2015) .............15

**Other**

28 U.S.C. § 1331 ..................................................................................................... 1

28 U.S.C. §§ 1291 and 1294(1) ............................................................................. 1

FED. R. CIV. P. 56(a).............................................................................................. 16

Americans with Disabilities Act, Title II........... 1, 12, 14, 15, 26, 29, 31, 33, 34, 36

42 U.S.C.A. § 12132 (2018) ................................................................................. 30

Rehabilitation Act of 1973 ...................................................................... 30, 32, 34

Title VI Civil Rights Act of 1964 ........................................................................ 30

28 C.F.R. § 35.130(a)............................................................................................ 30

H.R. REP. NO. 101-485, pt. 2, at 84 (1990), *as reprinted in* 1990
U.S.C.C.A.N. 267, 367 ........................................................................................ 32

## PRIOR OR RELATED APPEALS

No prior or related appeals have been filed.

iv

## JURISDICTIONAL STATEMENT

Plaintiff Carolyn Hans filed this lawsuit against Defendants Board of Shawnee County Commissioners and Sheriff Herman Jones in the United States District Court for the District of Kansas, asserting claims for violations of federal and state law. The district court had jurisdiction over Hans' federal civil rights claims and her claims under the Americans with Disabilities Act by virtue of 28 U.S.C. § 1331. On April 5, 2018, the District Court entered judgment resolving all claims brought by Hans in favor of the Defendants. (Memorandum and Order, Doc. 79.) Hans timely filed a notice of appeal on May 4, 2018. (Notice of Appeal, Doc. 83.) This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

## ISSUES ON APPEAL

I.      Whether material facts remain controverted precluding summary judgment?

II.     Whether the District Court erroneously determined that as a matter of law, the deputies in question had probable cause to arrest Plaintiff?

III.    Whether the District Court erroneously determined that the Plaintiff is required to show "intent" on the part of Defendants in her Title II Americans with Disabilities Act claims, a question of first impression for this Court?

1

IV.    Whether Plaintiff's state law claims are clearly established by the facts in the record and this Court should allow Plaintiff to present these claims to a jury for consideration?

## STATEMENT OF THE CASE

The parties and the District Court spent a total of 132 pages briefing the facts related to this case at summary judgment stage. For a comprehensive review of all relevant facts, those sources in the record and Appendix will provide the most detail. For this appeal brief, Plaintiff emphasizes and sets forth the material facts as follows:

**Background**

Carolyn Hans was born deaf to deaf parents. (Aplt. App. at 455.) She first learned to communicate by American Sign Language. ("ASL") (Aplt. App. at 455.) Carolyn testified that her family and friends are deaf, so her primary form of communication is ASL. (Aplt. App. at 455.) Carolyn testified that she can "lip read" just a "tiny, little bit." Carolyn stated that she can usually understand about two words at a time but no complex thoughts or phrases. (Aplt. App. at 455.)

The Plaintiff obtained the expert witness testimony of Dr. Jean Andrews in this case. (Aplt. App. at 580-597.) Dr. Andrews extensively tested Carolyn and determined that lip reading is not effective because Carolyn only understands

short, superficial statements and about 64% of what is being said. (Aplt. App. at
585.)

Hans testified that she uses an interpreter to speak to the general public but
that if there is no interpreter present that she could write notes, for example to a
grocery store clerk. (Aplt. App. at 454-455.) Ms. Hans testified that she and her
ex-husband Raymond "wrote notes" and he learned to sign.  (Aplt. App. at 455.)

**April 3, 2015 Incident**

On April 3, 2015, Carolyn testified that she and Raymond were in an
argument. She attempted to leave the marital home located at 4345 NW Button, in
Topeka, Kansas. Raymond took her keys to the Cadillac vehicle parked in their
driveway that was generally considered "her" car. (Aplt. App. at 461.) Carolyn
testified that after Raymond took the keys to her vehicle, she grabbed the keys to
his truck from the shop. (Aplt. App. at 461.) The truck was parked next to
Carolyn's vehicle in the driveway. (Aplt. App. at 461.) After Carolyn grabbed the
truck keys, Raymond got in the Cadillac and backed out to block his own truck in,
presumably so that Carolyn could not leave in his truck. (Aplt. App. at 461.) [The
vehicles are clearly in the position Carolyn described in the video. (Aplt. App. at
869, Exhibit 13 at 5:35-5:40.)] Carolyn jumped in the Cadillac with Raymond and
called 911. At this time, there had been absolutely no physical contact between the
parties. (Aplt. App. at 460.)

3

After the 911 call, Raymond got out of the vehicle and opened the hood on the Cadillac. Carolyn does not know what he was doing but suspected he was messing with the wiring on her car. (Aplt. App. at 460.) Carolyn got out and closed the hood of the vehicle. (Aplt. App. at 460.) After Carolyn closed the hood, Raymond found "something" and threw it at Carolyn's face, striking her. (Aplt. App. at 460.) At the time that Raymond threw something at her, Carolyn had no idea what it was. Then Raymond went to the garage and got a tool. Raymond began to attempt to drain the air out of the tires on Plaintiff's vehicle. (Aplt. App. at 459.) Raymond admitted that he tried to drain the air from her tires in the video interview when asked by the Sheriff's deputy. (Aplt. App. at 869, Exhibit 11, 5:07.)

Reports from the Shawnee County dispatch department show that four 911 calls were placed at 8:45 p.m., 8:47 p.m., 8:48 p.m., and 8:59 p.m. (Aplt. App. at 467.) Deputy Justin Dobler and Corporal Jace Beightel were dispatched at 8:56 pm. (Aplt. App. at 467.)

When Beightel first questioned Raymond, he told Beightel "We been married almost 20 years, we got in an argument earlier in the night and she left. When she came home I tried to jump in her car and leave." (Aplt. App. at 869, Exhibit 11 at 1:55-2:01.) This explanation is at complete odds with his statement to 911 Dispatch wherein Raymond reported that his wife wanted to leave but he did

4

not want her to leave because he wanted "to talk about it." (Aplt. App. at 467.) The contradiction of these two statements was never considered or explored by the deputies.

Later in the encounter, Raymond admitted to the officers that he had drank "about 6 beers" earlier that evening (the incidents occurred between 8:45pm and 9:00pm). He further told them when Carolyn came home from their first fight, she went in her bedroom and got her iPad and he knew she was going to "take off" again. (Aplt. App. at 869, Exhibit 12 at 3:45-3:59.) Raymond also reported that he took her keys and was trying to drive away in her vehicle. (Aplt. App. at 869, Exhibit 12 at 3:45-3:59.) This statement is partially consistent with Carolyn's deposition testimony that Raymond took her keys and was trying to prevent her from leaving. (Aplt. App. at 461.)

Carolyn admits on the video and in her deposition, that when Raymond tried to drain air from her tires to prevent her from leaving, she tried to push him off of the tire. Carolyn believes she pushed Raymond with her hands and one foot on his buttocks. (Aplt. App. at 456.) At this time, Carolyn was behind Raymond and Raymond was on "all 4's" in front of her with his hands in the mud. (Aplt. App. at 459-460.)

Carolyn testified plainly that she never stomped on Raymond's hand. (Aplt. App. at 460.) Carolyn testified that she did not kick Raymond during the

interaction. (Aplt. App. at 459-460.) The push was the only physical contact. Both

deputies determined the push was not a battery at the time of the interaction. (Aplt.

App. at 869, Exhibit 12 at 4:20-4:30.)

The District Court order incorrectly notes the timeline of Deputy Dobler's

investigation and his attempts to communicate with Ms. Hans. The Order notes

that "Deputy Dobler asked 'What happened?' and plaintiff responded by gesturing

that she had pushed Mr. Hans." (Aplt. App. at 813.) The body cam video, however,

shows that Dobler comes into the home after his first interaction with Ms. Hans in

the driveway and asks Mr. Hans if he has her keys. (Aplt. App. at 869, Exhibit 11,

3:55-4:10.) There is not yet any discussion about pushing. After Dobler comes in

the home, Beightel instructs Dobler "go ask her if she pushed him down in the

mud." (Aplt. App. at 869, Exhibit 11, 4:15-4:20.)

Dobler obliges and then after the second "interview" with Carolyn, Dobler

comes into the home and asks Raymond "why did she push you in the mud?"

Raymond quickly admits he was trying to damage her car tires. (Aplt. App. at 869,

Exhibit 11, 4:55- 5:10.) Dobler states in the video "She was protecting her property

'cause she thought you were damaging it…" He later states "If you came up to my

car and I caught you messing with it, I'd push you away from it, too." (Aplt. App.

at 869, Exhibit 11, 5:39-5:48.)

**Deputies' Analysis**

Dobler repeatedly testified that Carolyn pushing Raymond off of her tire was not a battery and there was no probable cause to arrest Carolyn for taking that action. (Aplt. App. at 479-481, 494-495.) Further Dobler testified that after everyone had returned keys and Carolyn had obtained her belongings from the house, "we had reached an agreement" or a resolution to the situation. Dobler stated "I was good with the situation." (Aplt. App. at 479-480.) The body cam video shows the two deputies talking about the situation in the Hans' bathroom, evaluating whether or not they should make an arrest. They ultimately decided against it. (Aplt. App. at 869, Exhibit 11, 6:04-6:17; Exhibit 12, 0:00-0:14.)

Dobler never developed a reasonable understanding of what occurred during the dispute with the parties. (Aplt. App. at 478.) Dobler testified that Carolyn "admitted" to pushing, kicking and stomping on Raymond but could not say which action happened in which order. (Aplt. App. at 482.) Dobler was uncertain when he learned about Raymond trying to bleed the air out of Carolyn's tires. (Aplt. App. at 478.) Dobler complained that it was "really hard to add up the time line" because there were two sides of the story. (Aplt. App. at 482.)

Dobler's observation was that after a resolution was reached, Beightel explained to Carolyn why she was *not* going to jail. (Aplt. App. at 480.) At this time, Carolyn had a "rising with her emotions" and she "reenacted" what

happened. (Aplt. App. at 480.) Dobler testified that the video showed Carolyn

kicking and pushing Raymond. Dobler testified that her actions were "stomp, kick

and push" and that "without a doubt" it was intentional. (Aplt. App. at 482.)

Beightel testified Carolyn never acted out a "stomp" and after watching the video

testified she never showed a "stomp". (Aplt. App. at 523.)  Deputy Dobler then

testified that she was *not* arrested for pushing Raymond but she *was* arrested for

"stepping" on him and kicking him. (Aplt. App. at 486.) Dobler testified that

Beightel was present when Carolyn made the stomping motion and when she

allegedly reenacted this action. (Aplt. App. at 491.) Beightel disputes Dobler's

testimony, what the video shows and what he saw that night in regards to

stomping. (Aplt. App. at 523.)

There is no testimony or video footage of anyone asking Carolyn if she

wanted to fill out a written statement. Carolyn did not fill out a written statement of

what occurred. Dobler testified a written statement from Carolyn was not

necessary because he had already decided to arrest her. (Aplt. App. at 501)

In his deposition, Beightel testified inconsistently about probable cause to

arrest Carolyn. (1) Beightel testified that if Carolyn admitted she touched

Raymond during their fight, there was probable cause to arrest Carolyn for battery

and Beightel had no choice but to arrest her.  (Aplt. App. at 519-520.)  (2) Beightel

also testified that even though Carolyn admitted to pushing Raymond, he and

8

Dobler determined there was not probable cause to arrest Carolyn. (Aplt. App. at 511.) (3) When asked if Carolyn's push on Raymond was sufficient to be a battery, Beightel testified in a non-committal method "It depends on the push." (Aplt. App. at 514). Finally, Beightel seems to conclude that any physical contact by Carolyn against Raymond was a battery. (Aplt. App. at 520.) But when asked why Carolyn wasn't immediately arrested after her admission of the push, Beightel provides no explanation for why the call did not end at that time by placing Carolyn under arrest. (Aplt. App. at 520.)

The District Attorney specifically declined to pursue criminal charges against Carolyn noting "There is insufficient evidence of a criminal offense, she shoved him to prevent him from letting the air out of her tires." (Aplt. App. at 527.)

**Jail Interaction**

Angelica Hutting acted as the Book-in officer for Carolyn Hans. Hutting has no memory of the interaction or the facts of this case, but testified based on forms she filled out. (Aplt. App. at 530.) Because Hutting has no memory of her interview with Ms. Hans, the only way to ask her questions about the interaction was with Hutting's paperwork. Hutting's paperwork admittedly made no sense and did not support her "findings" that Carolyn was feeling helpless or hopeless. (Aplt. App. at 532, 536, 538.) Hutting testified she has no recollection of where that

information came from. (Aplt. App. at 533.) Hutting's memo to Anderson indicates Carolyn was feeling "a little bit" helpless and hopeless. (Aplt. App. at 620.)

Josh Anderson performed the suicide screening on Carolyn. Anderson has no recollection of how Carolyn communicated the words "a little bit" to him in response to the helpless/ hopeless question. (Aplt. App. at 542.) Anderson testified that he *believes* Carolyn wrote notes to him but he threw these notes away. (Aplt. App. at 540-541, 544.) Ms. Hans specifically testified that she gestured and used facial expressions in response to reading the question of hopeless/ helpless. Carolyn specifically controverted Anderson's testimony, stating "Those were his words that he wrote down." (Aplt. App. at 462.) When the follow-up question was asked "So you did not say, a little bit?" Carolyn plainly denied the very answer that put her in suicide watch: "No. I didn't say a little bit. There was no interpreter or anything. There was no written notes. It was just this form and pointing to him. So, I was doing my best." (Aplt. App. at 462.) When asked a third time, Carolyn again explains "I just showed a gesture that—that—just that exasperation…I was in shock, I don't know. That was my expression to him, my gesturing to him." (Aplt. App. at 462.)

Following intake, Carolyn was strip searched and issued a defective suicide garment that either had broken Velcro or did not fit her. (Aplt. App. at 463.) Carolyn was naked under the garment and exposed to the jailers. (Aplt. App. at

10

546.) Carolyn's testimony is that she was eventually issued a suicide watch

blanket to cover her garment that did not fit correctly. (Aplt. App. at 463.)

Carolyn requested the use of a toilet and was instructed to urinate in a grate

on the floor. Shawnee County Department of Corrections Policy No. IS-E-18

discusses the conditions of "suicide watch" inmates. (Aplt. App. at 552-579.) The

policy specifically states that suicide watch inmates should have access to toilets

as often as reasonable. There is nothing in the record to establish that it was

unreasonable to transport Carolyn from her cell to a normal toilet. Carolyn had to

gesture to a jailer that she needed to use the bathroom and needed toilet paper. She

was not able to write her needs down. (Aplt. App. at 463.)

The District Court's order quotes extensively from Defendants' expert's

report. It is interesting to note that Dr. White, an alleged expert on jail policies and

suicide watch, opined about Josh Anderson's mental state, specifically noting that

his interactions with Ms. Hans were "conducted in a professional and well

intentioned manner." (Aplt. App. at 824.) Dr. White provides *no source

information* to establish that Anderson was either professional or well-intentioned

at the time of Ms. Hans' interview. This opinion is outside the scope of Dr.

White's expertise and is a controverted issue of fact. It should have no bearing on

the Court's analysis of the issue of law—namely whether the ADA was violated

11

when Ms. Hans was denied accommodation or an interpreter when she clearly did not understand what was happening.

Following the Pretrial Conference, the Plaintiff's claims against Defendants were defined as follows: (1) Americans with Disabilities Act, Title II claims; (2) Section 1983 Wrongful Arrest Claims; (3) Kansas state law claim for false arrest; (4) Kansas state law claim for negligent training; (5) Kansas state law claim for negligent supervision; and (6) Kansas state law claim for intentional infliction of emotional distress.

Following the close of discovery, the County submitted a dispositive motion on all of the Plaintiff's claims. The District Court granted the motion on all claims and entered judgment for Defendants, including assessing Defendants' costs against Plaintiff. The District Court's Memorandum and Order granting summary judgment to Defendants noted that the deputies in question had probable cause to arrest Ms. Hans because in reviewing the "totality" of the circumstances, the deputies "reasonably concluded" that Ms. Hans touched her husband in a "rude, insulting, or angry manner". The District Court determined that Ms. Hans' ADA Title II complaint fails because she did not plead or establish "intentional discrimination." The District Court further determined that the Plaintiff's state law claims failed as a matter of law.

12

## SUMMARY OF PLAINTIFF'S ARGUMENTS

The Plaintiff's brief argues against two primary conclusions by the District Court, one factual, one legal.

The factual record before this Court establishes significant evidence that Ms. Hans and the arresting deputies did not have effective communication. Despite extensive evidence establishing a lack of communication, the District Court ultimately determined this critical issue of fact in favor of Defendants, by determining that the attempts at communication were sufficient. Such a conclusion by the District Court wholly undermines the purpose of Summary Judgment, which is to determine if there are conflicting facts. Further, the District Court invades the province of the jury by accepting untrained deputies' interpretations of miming and gestures as undisputed "facts." Again, the District Court ultimately determined that the deputies "interpretations" of Plaintiff's physical "gestures" amounted to an admission of committing a crime.

In addition, the factual record regarding Plaintiff's interactions with the jailers was equally fraught with conflicting information. The record before the District Court established that the correctional workers completed their forms incorrectly and in a nonsensical way that did not support their "narrative." The correctional workers in question had no independent recollection of the events in question and therefore had to rely exclusively on their incorrect and nonsensical

forms for their testimony. Plaintiff's direct testimony controverted the forms, and Plaintiff plainly denied or controverted various facts put forth by Defendants through their forms. Despite this fully controverted record on Plaintiff's experiences at the jail, the District Court determined that there were no material controverted facts and granted judgment for Defendants on Plaintiff's claims related to her treatment at the jail.

On the probable cause analysis, the District Court's analysis reviewed the "totality" of the events surrounding Plaintiff's arrest, while the arresting deputies did not. On the date in question and in their depositions, both deputies testified that Plaintiff was free to leave the scene *until she gestured near her car*. This testimony establishes that the deputies did not consider "the totality" of the evidence, they relied solely on the Plaintiff's gestures, something which is far from clear, either from the video evidence or from their review of that evidence. The deputies themselves contradicted each other on what the video showed.

Finally, the Court determined that as a matter of law, the Americans with Disabilities Act, Title II, requires that Plaintiff establish "intent" by Defendants to discriminate in order to obtain remedies under the law. In this case, the evidence in the record clearly establishes that none (not one) of the deposed employees had training on how to interact with deaf citizens. The lack of training resulted in inappropriate classification and treatment of Plaintiff for the duration of her

interactions with Shawnee County employees. The plain language of the applicable statutes mentions nothing of intent or the *mens rea* of the governmental agency in Title II. The legislative history of Title II specifically indicates that the entire purpose of the ADA is to correct negligence and disparate impact from policies or practices that preclude a disabled person from full participation and benefit of governmental activities. This legal issue has split several Circuits, some supporting a reading of the word "intent" into the ADA and some rejecting this argument. This Circuit must reject the requirement of "intent"—it violates the rules of statutory construction, flies in the face of the purpose of the ADA and contradicts legislative history.

## PLAINTIFF'S ARGUMENTS AND AUTHORITIES

I.   MATERIAL FACTS REMAIN CONTROVERTED AND THE DISTRICT COURT FAILED TO ADDRESS THE ENTIRETY OF THE RECORD

A.   Standard of Review

The standard of review, based on the procedural posture of this case, is *de novo*. *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). This standard means the appeals court starts anew in its analysis of the evidence and the record before the District Court. "When *de novo* review is compelled, no form of appellate deference is acceptable." *Williams v. Owners Ins. Co.,* 621 F. App'x 914, 917-18 (10th Cir. 2015).

15

The well-established summary judgment standard states "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This Court must view the facts in the light most favorable to the nonmovant (Ms. Hans) and draw all reasonable inferences in her favor. *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013).

### B. Material Facts Remain in Dispute Precluding Summary Judgment

It is critical in the current case that this Court very carefully review those facts in the record and those facts inferred by general review of the case. In this matter, multiple critical factual issues are disputed by Carolyn Hans, with some evidence supporting one conclusion and some evidence supporting a different conclusion. In each instance, the summary judgment standard dictates that Ms. Hans receive the deference in the analysis, not the Defendants. The District Court decision, however, provides deference, time and again to Defendants.

This Circuit notes that a probable cause analysis on summary judgment must have all material facts resolved in order to be a proper case for summary judgment. *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312-1313 (10th Cir. 2002). In *Olsen,* the Tenth Circuit noted that the arresting officer and the arrestee told a vastly different version of the facts and circumstances leading to Mr. Olsen's arrest. *Olsen,* 312 F.3d at 1313. In reversing the district court, this Court stated "The

16

bottom line is that the district court failed to take into account several disputed factual issues in granting summary judgment on the basis of qualified immunity to Officer King on Appellant's two Fourth Amendment claims." *Id.*

After a review of the *Olsen* case, a review of the Order granting summary judgment in this case should be critically considered. In this case, the District Court ultimately concludes that Carolyn Hans and the employees of the Defendants did not have any impediments to their communication—because the District Court uses the Defendants' interpretations and memories as the facts, not Plaintiff's.

The record before the District Court and this Court shows that the arresting deputies do not agree as to many critical facts about Carolyn's arrest. Specifically, in consideration of the communication barrier, Carolyn's contention remains she *never admitted to a crime and never committed a battery*. The deputies, based on their "interpretation" of a gesture in the driveway in the dark, by a deaf citizen who is emotional, constituted an admission of committing a crime. In a case like this where the deputies themselves don't even agree with each other as to what Plaintiff's gestures were or what the body cam video showed, these factual issues *must go* to the jury.

Similarly, the record before the District Court clearly establishes that the communication between Carolyn and the jail staff was not effective. The correctional workers who screened and "interviewed" Plaintiff have no

independent recollection of their time with her. When confronted with mistakes and errors in their reports that do not support their conclusions, they do not have explanations. Carolyn's deposition clearly established that she denies giving the answers recorded on some of the paperwork. This denial creates a critical and material question of fact because her classification in a suicide watch cell is one of her causes of action. Rather than allowing a jury to decide whether Carolyn's testimony is more credible that the corrections workers and their "forms," the District Court just resolved all issues in Defendants' favor. Or the District Court simply did not consider that any of these disputed issues of fact contributed to its analysis of the legal issues.

Rather than recognize that the resolution of these fact disputes is the jury's job, the District Court summarily resolved conflicted issues of fact against the Plaintiff and entered judgment against her on all claims. Plaintiff respectfully requests that this Court closely study the material facts and evidence in the record and evaluate them for their evidentiary value. The errors and admissions by the Defendants' employees about their own investigations, their own recordkeeping and their own memories of the incidents establishes that the Defendants' "version" of the relevant facts is far from uncontroverted and subject to extensive impeachment. All of which must be done before a jury.

II.  **THE DEPUTIES DID NOT HAVE PROBABLE CAUSE TO ARREST MS. HANS AND THE DISTRICT COURT'S ANALYSIS ON THIS ISSUE FAILED TO ADDRESS THE DEPUTIES' SPECIFIC TESTIMONY ON THE ISSUE**

A.  **Standard of Review**

The appellate court must review the "district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court." *Kimzey v. Flamingo Seismic Solutions, Inc.,* 696 F.3d 1045, 1048 (10th Cir.2012).

B.  **The Deputies in this Case Testified They Arrested Ms. Hans Based on Her "Admission" to a Crime, Not on the "Totality of the Circumstances"**

The District Court opinion ultimately concludes "No reasonable jury could find that Corporal Beightel and Deputy Dobler lacked probable cause to arrest plaintiff." (Aplt. App. at 838.) In order to reach this conclusion, however, the District Court ignores the record on appeal which provides conflicting and inconsistent evidence. Further, the District Court relies on the state court judge's analysis of an affidavit that Corporal Beightel submitted which he later testified "could have been worded better." The state court judge's analysis of the affidavit is only as appropriate as the facts in the affidavit, which in this case were disputed by the other deputy on the scene and admitted to by its author as incomplete. Finally, the District Court appears to "review *de novo*" the deputies' actions, taking into consideration the "totality" of all evidence from the scene. This analysis is an error by the District Court because the two deputies specifically spoke about whether or

19

not to arrest Ms. Hans, decided not to arrest her and to allow her to leave the scene. The arrest was not based on 25 minutes of investigation and analysis into the facts. The arrest was the result of a deaf woman, gesturing near her car, in the dark, and the deputies' "interpretation" of these gestures.

In the Memorandum and Order, the District Court cites the standards to establish probable cause:

> Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that the person…was involved in the crime.

*Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017).

In finding that the deputies' arrest was supported by probable cause, the District Court relies, in part, on Judge Kingfisher's probable cause determination which, of course, relies on Corporal Beightel's affidavit. Judge Kingfisher's determination is only as reliable as the information he was provided, which in the current matter was not complete or accurate. As such the District Court's reliance on Judge Kingfisher's analysis is inappropriate and should not be a part of the analysis in this case. Beightel's affidavit represents that Ms. Hans admitted to kicking her husband. The record before the Court establishes that Ms. Hans denies ever kicking her husband before or after the porch conversation. The record indicates Ms. Hans denies making any such admission. Ms. Hans admitted to

20

pushing her husband. Mr. Hans accused Ms. Hans of stomping on his hand but never, not in 30 minutes, does Raymond say that she kicked him. The affidavit utterly fails to accurately represent the investigation or the parties' statements.

In the current matter, the deputies were on the scene for approximately 30 minutes. For the first 20 minutes, they attempted to understand the nature of the parties' dispute. After broken communication with Ms. Hans, due to her disability, and multiple interviews with Mr. Hans (who admitted he had drank a substantial amount of alcohol and that he had previously been arrested for domestic violence against Carolyn), the deputies determined no probable cause existed to support an arrest and decided to let Ms. Hans leave with her suitcase.

It is undisputed that prior to making the decision to allow Ms. Hans to leave with her suitcase, the deputies knew that (1) Ms. Hans wanted to leave the home; (2) Mr. Hans took her keys; (3) Ms. Hans could not leave because the other marital vehicle was blocked in; (4) Mr. Hans attempted to bleed air from her tires; and (5) Ms. Hans pushed Mr. Hans off of her tire so he could not damage the tire or drain it of air. Carolyn agreed to these facts. Raymond agreed to these facts. The deputies were aware of these facts. Despite the "trustworthy information" of person to person contact, admitted pushing, and a visible injury on Mr. Hans' hand, Corporal Beightel and Deputy Dobler *did not arrest Ms. Hans.* They conferred in a bathroom, during the incident and both agreed no arrest was required.

21

The only basis for arresting Ms. Hans was her "gestures" *after* Beightel pointed at her and re-escalated the situation. Deputy Dobler testified that Ms. Hans had a "rising of her emotion" when Beightel confronted her on the porch. Following the porch interaction, Ms. Hans makes multiple gestures on the porch, attempts to communicate orally (communication which neither Beightel nor Dobler understand), makes gestures by her car and shows obvious frustration. It is only after the porch and car interaction that the deputies decide she "admitted" to a crime. What was this admission? Gestures—by a deaf woman, in the dark, after becoming emotional, following an emotional fight with her husband which had been resolved and then re-escalated by Corporal Beightel. Therefore, the "reasonably trustworthy information" used by the Shawnee County deputies to support a probable cause argument was not Mr. Hans' injuries or prior statements, it was Ms. Hans' gestures, which she only made after Beightel confronted her. The gestures were her attempt to more fully explain a situation, in the dark, in her driveway.

The District Court's analysis is in error. When reviewing whether or not the deputies had probable cause to arrest Ms. Hans, the District Court reviewed the entirety of the parties' interaction. That analysis is only appropriate when the deputies' decision to arrest was based on the entirety of the parties' interaction and their investigation. This is not *de novo* review of the deputies by the District Court,

but instead an opportunity to review what the deputies considered. In this case, it is clear, based on video evidence and the deputies' testimony, that after 20-25 minutes of investigation, they could not reach a finding of probable cause. What changed in the last five minutes? Ms. Hans alleged "admission" to a crime.

The problem with this "admission" of course, is that Ms. Hans never admitted to a crime, never changed her story, never provided conflicting information. She already admitted to pushing her husband off the tire. Without the assistance of an ASL interpreter, the deputies merely speculated, inappropriately, as to what she was attempting to explain. Dobler stated on the video of the interaction, if Mr. Hans was attempting to damage his vehicle, he [Dobler] would have pushed him too. Dobler testified the push was not a battery. Beightel testified the push was a crime but had absolutely no explanation as to why he planned to allow her to leave the scene.

Hans' deposition testimony, with the assistance of an ASL interpreter, was very clear. She never kicked her husband. She pushed him with her hands and put her foot on his buttocks. Considering that Mr. Hans had no qualms with initially accusing the Plaintiff of "stomping" on his hand, it makes no sense that if he thought he had been "kicked," he would not have reported the same to the officers.

The District Court, however, does not simply review her gestures and analyze the actual "information" relied upon to make the arrest. The District Court

23

backtracks, and considers (1) Mr. Hans' prior interviews with the deputies (which the deputies had considered and rejected as sufficient to arrest Ms. Hans); (2) Mr. Hans' injury on his hand (which the deputies had considered and rejected as sufficient to arrest Ms. Hans); (3) Mr. Hans' status as having been drinking alcohol; and (4) Ms. Hans' prior admission of having pushed her husband (which the deputies had considered and rejected as sufficient to arrest Ms. Hans). The officers already had that information and determined it was not enough to arrest.

In order to reach its conclusion, the District Court focuses on the definition of domestic battery in the Kansas Statutes Annotated, specifically K.S.A. § 21-5414(2) which at the time stated domestic battery was "knowingly causing physical contact with a family or household member by a family or household member when done in a rude, insulting or angry manner." Kan. Stat. Ann. § 21-5414(2) (2015).

Again, at the time that the deputies were allowing Ms. Hans to leave, she had already admitted to pushing her husband off the tire. Again, prior to allowing Carolyn to retrieve her suitcase, the two deputies spent time in the Hans bathroom, evaluating the case and collectively made a determination that there was *not probable cause* for an arrest. She had already agreed she touched him to protect her vehicle and had provided the context of that touching. Deputy Dobler admitted at the scene and again at his deposition that pushing someone off your tire, who is

24

trying to bleed air from your tire, is not a battery. What changed? Carolyn did not

suddenly admit that her physical contact was "rude, insulting or angry." Ms. Hans

did not suddenly admit to intentional physical violence—she made a gesture while

trying to communicate with deputies who did not understand her.

It is helpful to review another decision in which this Court rejected law

enforcement officers' decision to arrest someone without sufficient information.

*Cortez v. McCauley*, 478 F.3d 1108, 1117-1123 (2007). In *Cortez,* this Court noted

that the arrest of Rick Cortez violated Section 1983 because it was based solely on

a double hearsay statement from a two year old child. It is important to note that

"A police officer may not close her or his eyes to facts that would help clarify the

circumstances of an arrest. Reasonable avenues of investigation must be pursued

especially when, as here, it is unclear whether a crime had even taken place."

*Cortez*, 478 F.3d at 1117 *citing BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986).

In evaluating what is required of an officer in an investigation, this court

notes that "the probable cause standard of the Fourth Amendment requires officers

to reasonably interview witnesses readily available at the scene, investigate basic

evidence, or otherwise inquire if a crime has been committed at all before invoking

the power of warrantless arrest and detention." *Romero v. Fay,* 45 F.3d 1472, 1476

(10th Cir. 1995).

At this point, the question of effective communication and accommodation under the Americans with Disabilities Act must play into the Court's analysis. The District Court, never once, considers that there was ineffective communication with Ms. Hans, and only focused on her "admissions" and other evidence which the deputies had previously rejected as insufficient to arrest her. Carolyn testified that she did not understand very much of what the officers were saying on the scene. Her testimony was that the only thing she clearly remembered Dobler saying was his initial question of "what happened." It is a factual issue for the jury's consideration, in light of all evidence, including the testimony of Ms. Hans' expert, Dr. Andrews, as to whether or not a fact finder believes this testimony from Ms. Hans. The deputies, in the video, repeatedly say "Huh?" and make gestures that they do not understand what Carolyn is trying to say. When replaying the video during their depositions, they did not understand Ms. Hans on multiple occasions and specifically, when she walked off the porch and into the driveway, attempting to speak, and trying to "explain" herself.

In *Cortez*, the Tenth Circuit deemed Cortez's arrest to be unconstitutional because the officers failed to interview witnesses, failed to inspect any physical evidence and failed to even obtain a report from a doctor about whether a child had been sexually assaulted. (The report was expected in the shortly foreseeable future.) *Cortez*, 478 F.3d at 1117.

26

In this case, similar to the facts in *Cortez*, the officers utterly failed to conduct a reasonable investigation. If Ms. Hans' gestures appeared to indicate a battery, the officers could have conducted multiple investigative activities to actually figure out if probable cause existed. They could have written down a simple question "Did you kick your husband?" They could have asked Mr. Hans directly "Did your wife ever kick you?" They could have had the parties fill out written statements, as recommended by Shawnee County's own policy on domestic violence calls. They could have called dispatch and asked for an ASL translator. They could have attempted to create a timeline to place the contact in context. The officers should have attempted to determine whether or not Carolyn's actions were "defensive combat" under K.S.A. 21-5222, as outlined and discussed in their own domestic violence policy. These officers did nothing other than look at her gestures and arrest her in her driveway.

This Court in *Cortez* notes that "the sequence of the investigation that did occur is plainly part of the facts in this case—and it is clear that the officers got ahead of themselves." *Id.*, 478 F.3d at 1121. It is critical in the current matter to note that the officers interviewed the parties, then conferred, then talked to the parties again and *then determined no probable cause.* The deputies planned to let Ms. Hans leave. (Dobler even testified he was satisfied with the resolution of the matter.) Rather than just having the parties separate, Beightel, for whatever reason,

felt compelled to confront Ms. Hans about her conduct. This lecture caused a "rising with her emotions" (words used by Dobler), then gesturing and suddenly— *probable cause.* There is no analysis by the lower court of what exactly about these gestures (in isolation) established an admission of a crime.

It is important in any case reviewing probable cause that the Court critically analyze the timeline of events at the scene and evolution of the facts as the officers investigate. The District Court's Memorandum and Order fails to consider the evidence, critically, at the time of the arrest.

In the current matter, similar to the officers in *Cortez*, the officers had some information that would cause a reasonable officer to further investigate. Rather than conduct themselves as reasonable officers, they rushed the process and arrested Ms. Hans. Beightel himself testified he wanted to hurry up the incident because he was sick. Dobler testified he did not believe pushing a person off her tire under these facts constituted a battery. And yet, despite these admissions, and the lack of any mention of kicking by the alleged victim, Carolyn was arrested based solely on her gesture.

This arrest lacked probable cause and was based solely on the officers' confusion and lack of appropriate investigation. This Court should reverse the lower court's findings of probable cause and allow a jury to consider this critical question of fact.

**III.    THE DISTRICT COURT'S DETERMINATION THAT PLAINTIFF MUST SHOW INTENTIONAL DISCRIMINATION TO RECOVER COMPENSATORY DAMAGES UNDER TITLE II IS CONTRARY TO THE ENTIRE OBJECTIVE OF THE AMERICANS WITH DISABILITIES ACT**

**A.    Standard of Review**

The appellate court must review the "district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court." *Kimzey v. Flamingo Seismic Solutions, Inc.,* 696 F.3d 1045, 1048 (10th Cir.2012).

**B.    The Americans with Disabilities Act Was Passed to Protect Disabled Citizens from "Benign Neglect" and Not Simply Intentional Discrimination**

In the current matter, the District Court anticipated that this Court would rule that Plaintiff is not entitled to any compensatory damages because she does not specifically plead intentional discrimination by the Defendants. As a result, Plaintiff's claims for failure to accommodate and other matters related to her disability are dismissed outright. Defendants argued and the District Court agreed that the current application of disability law makes it appropriate to deny compensation to an injured, disabled person, unless that person has evidence of intentional discrimination—a holding that runs contrary to the entire purpose of the ADA.

An overview of the law in question is helpful. Ms. Hans seeks enforcement of the Americans with Disabilities Act against the Defendants under Title II, which states in part:

> Subject to the provisions of this subchapter, no qualified individual
> with a disability shall, by reason of such disability, be excluded from
> participation in or be denied the benefits of the services, programs, or
> activities of a public entity, or be subjected to discrimination by any
> such entity.

42 U.S.C.A. § 12132 (2018). The plain language of the statute does not support

Defendants' reading. Nothing is mentioned in this statute about the "intent" of the

public entity. Instead, the Act is clearly written in a way to establish that a claim is

actionable if a qualified person is excluded by reason of their disability. Efforts

made by the public entity to be in compliance or to "mean well," or the opposite—

efforts made to intentionally exclude disabled citizens—neither scenario is

contemplated by the Act. The reasons for the absence of such language is because

"intent" is wholly unrelated to recovery under the statute.

Throughout the statutory structure, the ADA is intertwined with the

Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964. The

related regulations under the CFR to the ADA, however, also focus extensively on

accommodation and deprivation of rights—not one of the regulations establishes

any need for intentional action by a public entity. *See* 28 C.F.R. § 35.130(a).

In order to appreciate the context of the ADA, however, it is helpful to

review the Legislative history behind this Act. Specifically, Judge Jenkins' dissent

in *Tyler v. City of Manhattan,* 118. F.3d at 1407-08 (10th Cir. 1997) (emphasis

added) outlines the fact that the entire purpose of the ADA is to prevent harm to

disabled individuals as a result of something much less obvious than

discriminatory intent—indifference:

> In enacting the ADA, Congress recognized that discrimination against
> the disabled is often the product of indifference rather than animosity.
> *See* H.R. Rep. No. 485(II), at 29, *reprinted in* 1990 U.S.C.C.A.N. at
> 310–11. Congress also recognized that the effect of discrimination
> against the disabled is the same, however, whether the motivation is
> malicious or benign. *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. 25
> (1988) ("Acts that have the effect of causing discrimination [against
> the handicapped] can be just as devastating as intentional
> discrimination"), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2186. Where,
> as here, Congress has mandated that public entities take affirmative
> steps to make reasonable accommodations for the disabled, an entity's
> subjective motivation in failing to carry out its statutory obligations
> (that is, whether its failure to act was the product of intentional
> discrimination against the disabled or of neglect or indifference)
> should not be dispositive. **<u>"[E]ffect, and not motivation," should be
> the "touchstone" of an ADA claim</u>**. *United States v. City of Black
> Jack,* 508 F.2d 1179, 1185 (8th Cir.1974) (referring to Fair Housing
> Act claims), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d
> 694 (1975).

*Tyler,* 118. F.3d at 1407-08. The District Court's decision for Ms. Hans fails to

explain how none of the applicable statutes, regulations or Legislative history

support a conclusion that intentional discrimination is necessary to establish a Title

II claim for damages. To the contrary, the only place that "intent" becomes a topic

of discussion is with some other Circuit appellate courts.

As noted by the District Court, the Tenth Circuit in *Tyler,* was specifically

requested to rule on this issue by a *micus curiae*, the United States of America. This

Court declined the request. *Tyler,* 118. F.3d at 1403-04. The sole question on

31

appeal in *Tyler* focused on plaintiff's contention that he had preserved certain

arguments in his Pretrial Order. This Court did not determine that a party could

not recover damages if they did not plead intentional discrimination. It would be

inappropriate to say that such is the holding of the *Tyler* decision.

The District Court's ruling states that other Circuits' holdings are persuasive

and follows them in its analysis. The District Court fails to address the United

States Supreme Court opinion in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct.

712, 83 L.Ed.2d 661 (1985), where the Court states, in reference to the

Rehabilitation Act:

> Discrimination against the handicapped was perceived *by Congress* to
> be most often the product, not of invidious animus, but rather of
> thoughtlessness and indifference—of benign neglect. . . . [M]uch of
> the conduct that *Congress* sought to alter in passing the Rehabilitation
> Act would be difficult if not impossible to reach were *the Act*
> construed to proscribe only conduct fueled by a discriminatory intent.

*Alexander*, 469 U.S. at 295. The Supreme Court's review of the Legislative

History in *Alexander* very clearly focuses on the failure of our society to

accommodate those with a disability, not an intentional decision to exclude them.

Later, when the ADA was passed, the *Alexander* decision was directly cited by

Congress in its hearings noting that it intended for the ADA to be read in the light

of that decision. H.R. REP. NO. 101-485, pt. 2, at 84 (1990), *as reprinted in* 1990

U.S.C.C.A.N. 267, 367. The discussion reminds the reader of the fact that the most

commonly considered ADA claim, a lack of access due to architectural barriers, is

without a question a violation of the ADA. Was the original designer or the body

that maintained a non-compliant building trying to exclude the disabled? Or were

designs made and remodels occurring, simply without disabled people in mind?

The binding precedent of the US Supreme Court, coupled with the Legislative

history behind both the Rehabilitation Act and the ADA establishes that it was

never intended that disabled citizens show evidence of intentional discrimination to

support a claim of disability discrimination.

In support of its conclusion that the ADA, Title II, requires that Plaintiff

show intentional discrimination to establish a claim for damages, the District Court

notes that other Circuit courts have made this requirement. It is helpful of course to

note that there is a split in the Circuits on this issue. The Third Circuit has rejected

the "intentional discrimination" theory, noting:

> The ADA is intended to insure that qualified individuals receive
> services in a manner consistent with basic human dignity rather than a
> manner which shunts them aside, hides, and ignores them…we will
> not eviscerate the ADA by conditioning its protections upon a finding
> of intentional or overt "discrimination."

*Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995). In *Washington v. Indiana*

*High School Athletic Ass'n, Inc*., 181 F.3d 840 (7th Cir. 1999), the Seventh Circuit

noted "We cannot accept the suggestion that liability under Title II of the

Discrimination Act must be premised on an intent to discriminate on the basis of

disability." *Washington,* 181 F.3d at 847. The *Washington* Court specifically noted

33

that the legislative history clearly establishes that Congress intended that disabled

individuals would be able to bring claims for failure to accommodate. *Washington,*

181 F.3d at 848. The Sixth Circuit also agrees with this line of cases, stating "Title

II does more than prohibit public entities from intentionally discriminating against

disabled individuals. It also requires that public entities make reasonable

accommodations for disabled individuals so as not to deprive them of meaningful

access to the benefits of the services such entities provide." *Ability Center of*

*Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (2004).

Finally, it would be helpful to review the Tenth Circuit's own ruling in

*Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 (1981). In *Pushkin*,

the Tenth Circuit considered a Rehabilitation Act claim wherein a doctoral

candidate with Multiple Sclerosis sued the University of Colorado alleging he was

denied admittance to a program as a result of his disability. The Tenth Circuit

panel rejected the intentional discrimination argument under Section 504 of the

Rehabilitation Act:

> The University maintains that under a "disparate treatment" analysis it
> must be shown that the University's decision was motivated by
> intentional discrimination, and since the trial court has held that the
> University acted in good faith, no discriminatory purpose was found.
> The disparate treatment analysis is inapplicable to a claim under §
> 504. Defendants are creating a straw man and thereafter destroying it.
> It would be a rare case indeed in which a hostile discriminatory
> purpose or subjective intent to discriminate solely on the basis of
> handicap could be shown.

*Pushkin v. Regents of University of Colorado*, 658 F.2d at 1385 (10th Cir. 1981). This case is highly relevant to this panel's review of the issue. The District Court order notes that this Court reviews decisions from the Rehabilitation Act in analyzing ADA claims. The *Pushkin* decision establishes that nearly ten years before the ADA became law, this Court had already rejected this notion that an injured, disabled party had to show "intent" to survive a dispositive motion.

Carolyn Hans and countless other individuals with disabilities live and work and deal with a society that does not understand their needs every minute of every day. Despite this fact, these individuals function and manage their lives without filing lawsuits every day. In this case, the fact that Ms. Hans was deprived of her liberty interests and detained in jail is not because she was subject to nefarious deputies who wanted to pick on a disabled person. Ms. Hans' rights were violated because she could not communicate effectively with Defendants' employees and these employees made absolutely no effort to sincerely accommodate her disability.

The evidence of the deputies' inability to understand her (both at the time of the incident and at the time of their depositions) is important. They claim "no barriers" to communication, but they admit they cannot understand Ms. Hans. The evidence of faulty, confusing, and poorly completed forms by the deputies and at the jail are critical for consideration not because they reveal evil intent. The

documents establish that Shawnee County and its Sheriff's Department completely failed to provide the most basic accommodation to Ms. Hans—effective communication.

The Defendants did not provide Carolyn an opportunity to write out her account of the events with her husband leading her to call 911. The Plaintiff was not allowed an opportunity to participate in follow-up questions. All of the Defendants' witnesses collectively established that an ASL interpreter was literally a phone call away. Not a single employee called, despite the fact they knew that Ms. Hans and anyone with a communication barrier is entitled to an interpreter. Rather than provide the simplest accommodation, Ms. Hans was falsely arrested, subjected to unconstitutional jail conditions, and sustained real and serious damages.

The entire purpose of Title II is not to create new tests to eliminate disabled citizens' claims. The goal of Title II is to remove barriers to disabled people's ability to fully participate in society. This Court should reject the argument that Title II requires that a party establish "intentional discrimination."

## IV.   PLAINTIFF'S STATE LAW CLAIMS SHOULD BE PRESERVED FOR A JURY'S CONSIDERATION

### A.    Standard of Review

The appellate court must review the "district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court." *Kimzey v. Flamingo Seismic Solutions, Inc.,* 696 F.3d 1045, 1048 (10th Cir.2012).

**B.     Plaintiff's Kansas Law Claims Are Well Supported by the Record Before the Court**

In the current matter, the District Court granted judgment to Defendants on the Plaintiff's state court claims.

The Pretrial Order set forth several claims under Kansas state law. The Court again granted Defendants judgment on all claims.

**1.     <u>False Arrest</u>**

Plaintiff's theory in this case is that whether or not probable cause existed to support the Plaintiff's arrest is a question of fact for the jury to decide. If this Court reverses the erroneous lower court ruling on probable cause as it relates to Section 1983, then the Kansas false arrest claim should also go to the jury.

The Defendants are only afforded Kansas Tort Claims Act protection when an arrest is made with probable cause. If this Court reverses the District Court's rulings and finding on probable cause, then the claim of false arrest is resurrected and becomes viable.

Plaintiff respectfully requests that this Court reverse the lower court's ruling on probable cause and determine that the Plaintiff's claim should be evaluated by a

jury. It is ultimately a fact question as to whether or not the gestures by Carolyn were sufficient to cause a "reasonable officer" to believe a crime had been committed.

### 2.    <u>Negligent Training</u>

Kansas common law includes a claim for "negligent training." This claim as well as companion claims of negligent hiring and retention and negligent supervision are discussed in detail in *Estate of Belden v. Brown Cnty*., 46 Kan. App. 2d 247, 283, 261 P.3d 943, 968 (2011). In *Belden,* the Kansas Court of Appeals noted that these claims "impose direct liability on an employer or policymaker rather than vicarious liability for the misconduct of an underling." *Estate of Belden v. Brown Cty.,* 46 Kan. App. 2d 247, 282, 261 P.3d 943, 967 (2011) *citing Marquis v. State Farm Fire & Cas. Co.,* 265 Kan. 317, 334–35, 961 P.2d 1213 (1998).

A claim based on negligent training depends upon establishing facts showing that more or better training would have prevented the harm. *Id.,* 46 Kan. App. 2d 247, 283, 261 P.3d 943, 968. There is nothing in the *Belden* opinion that requires expert testimony to establish a cause of action. There is nothing in this opinion that requires 'notice' to the employer that their workforce is not appropriately trained, such as prior instances advising them they needed to train

their employees better. The District Court is simply reading into *Belden* facts and requirements that are not there.

To the contrary, again, the District Court shortcuts the ability of the Plaintiff to make her case to a jury. A jury should be able to evaluate the simple facts in this case. Defendants never trained their employees on working with hearing impaired citizens and never trained them on compliance with the ADA. This fact is undisputed. The question of fact is would more or better training have prevented the harm? That question is a question of fact that a jury could properly evaluate at the time of trial. Following the trial testimony of Dr. Andrews, it would be a reasonable fact for a jury's consideration.

Simple facts in this case establish that every single employee was woefully unprepared to deal with a hearing impaired citizen. Training to advise normal behaviors and conduct for deaf individuals; the fact that English is not a deaf person's "first language;" the fact that deaf people can't just "automatically" read lips—training on these issues would have clearly protected Ms. Hans from the treatment that she received.

Dobler testified "I wouldn't consider her truly deaf but you could see there was some impairment." (Aplt. App. at 493.) When asked whether or not Dobler had any audiology training to ascertain whether or not someone was "truly deaf," he admitted he had no such training. (Aplt. App. at 493.)

Beightel testified that he thinks Carolyn's primary language is English. (Aplt. App. at 525.) He further testified he has no training on how to work with non-English speaking individuals. (Aplt. App. at 473, 507.)

Anderson conveyed during an interview with Matt Biltoft that Carolyn was "able to read lips." (Aplt. App. at 623.)

Biltoft has no formal training on how to work with hearing impaired individuals effectively. (Aplt. App. at 631.) Biltoft did testify that he had worked directly with a deaf prisoner at one time in his career. (Aplt. App. at 629.)

The District Court's ruling summarily dismisses that there is any claim on negligent training because the record is not sufficiently developed or the claim is not more completely outlined in the Pretrial Order. Negligent training is well established in Kansas common law, and there is no specific requirement to plead this cause of action. It has been sufficiently pled, and the Plaintiff requests that she be allowed to present this claim to a jury. The lower court resolved this issue of fact in Defendants' favor with no further analysis, and such a decision should be reversed on appeal.

Negligent supervision results when an employer fails to supervise their employees in their performance for specific concerns. In this case, again, the employer provided no oversight and obviously no training or guidance on their employees' work with hearing impaired citizens. As such you have correctional

officers presuming all deaf people can read lips. You have a deputy making the decision that someone "isn't really deaf." This failure to supervise contributed to the harm sustained by the Plaintiff when she was arrested without probable cause and jailed under conditions that were not appropriate for her.

### 3.    <u>Intentional Infliction of Emotional Distress</u>

The Defendants' employees, within the scope of their employment, subjected Ms. Hans to unreasonable and outrageous conditions. Carolyn's arrest, based on a gesture; Carolyn's suicide risk classification subjected her to more humiliating jail conditions (nakedness, a broken garment, urinating in a grate on the floor); Carolyn's inability to effectively communicate with her jail staff. This treatment stemmed from their lack of training.

The same conduct that gives rise to Plaintiff's other claims establishes a claim for the Tort of Outrage under Kansas law.

The Kansas Tort Claims Act allows the Plaintiff to sue the Defendants for the tort of outrage based on their employees' actions. *Commerce Bank of St. Joseph, N.A. v. State of Kansas,* 251 Kan. 207, 833 P.2d 996 (Kan. 1992). The District Court's dismissal of this claim is in error. Plaintiff respectfully requests that the Court overturn this ruling.

## **CONCLUSION**

Plaintiff asks that this Court reverse the judgment entered by the District Court in its Order granting Defendants summary judgment on all claims. The District Court's analysis relies on conclusory findings of fact on some of the most critical issues of fact: (1) Was "communication" between Defendants, their employees, their contractors and the Plaintiff effective? (2) Did Plaintiff's "gestures" constitute an admission of a crime? (3) What information did the deputies use to form their probable cause theory? (4) Were the answers and the information used by jail staff in their interaction with Plaintiff even her answers?

The record establishes that every single answer to these critical questions is controverted. Despite the conflicting record, the District Court erroneously determined these issues of fact. Further, the District Court's legal rulings are based on the factual version that supported the conclusions necessary to enter judgment for Defendants. On appeal, Plaintiff respectfully requests that this Court reverse the errant rulings because they are inconsistent with the comprehensive record on appeal. Plaintiff is entitled to a trial by jury on all claims.

## REQUEST FOR ORAL ARGUMENT

Plaintiff requests oral argument in this matter because some of the legal issues presented by this appeal are a matter of first impression for this court, important and complex. By necessity, Appellant's brief included a limited recitation of the facts, so oral argument will also provide the Court with an opportunity to ask questions of counsel to clarify the facts and record on appeal among other questions on this appeal.

Respectfully submitted,

s/ Jennifer M. Hill
Jennifer M. Hill, #21213
McDonald Tinker PA
300 W. Douglas, Suite 500
Wichita, KS 67202
Phone:  (316) 263-5851
Fax:      (316) 263-4677
Email:  jhill@mcdonaldtinker.com
*Attorney for Plaintiff/Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(g) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 10,048 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14-point type, Times New Roman.

s/ Jennifer M. Hill
Jennifer M. Hill, #21213
MCDONALD TINKER PA
300 W. Douglas, Suite 500
Wichita, KS 67202
Phone:  (316) 263-5851
Fax:     (316) 263-4677
Email:   jhill@mcdonaldtinker.com
*Attorney for Plaintiff/Appellant*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (a) no privacy redactions were necessary in this ECF submission; (b) the hard copies of any pleading required to be submitted to the clerk's office are exact copies of the ECF filing; and (c) the ECF submission was scanned for viruses using Bitdefender Endpoint Security Tools (BEST) 6.6.2.49,

44

said virus scan being conducted on a daily basis, and, according to the program,

said ECF submission is free of viruses.

> s/ Jennifer M. Hill
> Jennifer M. Hill, #21213
> MCDONALD TINKER PA
> 300 W. Douglas, Suite 500
> Wichita, KS 67202
> Phone:  (316) 263-5851
> Fax:      (316) 263-4677
> Email:   jhill@mcdonaldtinker.com
> *Attorney for Plaintiff/Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2018, I electronically filed the

foregoing **BRIEF OF APPELLANT** with the Clerk of the Court by using the CM/ECF

system, which will send a notice of electronic filing to the following:

> Ashley R. Biegert
> Jonathan C. Brzon
> James M. Crowl
> OFFICE OF THE COUNTY COUNSELOR OF SHAWNEE COUNTY, KANSAS
> 200 SE 7th St., Suite 100
> Topeka, KS 66603
> *Attorneys for Defendants/Appellees*

I hereby further certify that seven (7) hard copies of the **BRIEF OF**

**APPELLANT** will be sent by Federal Express overnight delivery on July 31, 2018

to:

Office of the Clerk
United States Court of Appeals for the Tenth Circuit
Byron White United States Courthouse
1823 Stout St.
Denver, CO 80257

s/ Jennifer M. Hill
Jennifer M. Hill

# ATTACHMENT A

Memorandum and Order (Doc 79)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CAROLYN HANS,

      Plaintiff,

v.

                                Case No. 16-4117-DDC

BOARD OF SHAWNEE
COUNTY COMMISSIONERS, et al.,

      Defendants.

## MEMORANDUM AND ORDER

Plaintiff Carolyn Hans is deaf.  On April 3, 2015, Shawnee County Sheriff Department officers arrested plaintiff for domestic battery and Shawnee County Department of Corrections ("DOC") officers jailed her.  She asserts that this conduct entitles her to relief under 28 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), and Kansas state law. Specifically, plaintiff asserts that defendants Board of Shawnee County Commissioners and Herman T. Jones, Shawnee County Sheriff, violated 42 U.S.C. § 1983 when their employees unlawfully arrested her and violated the Fourth Amendment.  She also alleges that both defendants failed to accommodate her disability and thus violated Title II of the ADA.  Finally, she asserts that both defendants violated Kansas state tort law because their employees falsely arrested her and intentionally inflicted emotional distress on her, and also because defendants negligently trained and supervised their employees.

Defendants have moved for summary judgment against all plaintiff's claims.  Doc. 64. For the reasons discussed below, the court grants summary judgment against all plaintiff's claims.

I.    **Facts**

The following facts govern this motion.  They are uncontroverted or, where controverted, are recited in the light most favorable to the plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

A.    **Plaintiff's Background**

Plaintiff Carolyn Hans has a hearing impairment and is a qualified individual with a disability under the ADA.  She was born deaf and her parents are deaf.  She first learned to communicate by American Sign Language ("ASL").  Because plaintiff's family and friends are deaf, ASL is plaintiff's primary form of communication and she uses it on a day-to-day basis. She also uses ASL with the general public when an interpreter is present.  When no interpreter is present, she commonly communicates by writing notes.  Typically, she communicated with her husband, Raymond Hans, through handwritten notes.  Plaintiff can "lip read just a tiny, little bit." Doc. 72-3 (Hans Dep. 25:3–4).  She described it as being able to catch one or two words at a time, but she also said she misses most of what is said.  To communicate by phone, plaintiff has used a video relay service on her phone for about three years.

Plaintiff has designated Dr. Jean Andrews, a Ph.D. in speech and hearing, as an expert in this case.  Dr. Andrews has provided an opinion that English is plaintiff's second language.  Dr. Andrews also opines that plaintiff would have difficulty learning to read and understand English because it is an auditory-based language.  Dr. Andrews explained, "You must hear the English [language] to learn to read it."  Doc. 72-13 at 8 (Andrews Report).

Dr. Andrews believes that English language modes of communication, including "speech, lipreading, reading and writing <u>do not</u> constitute effective modes of communication for [plaintiff]." *Id.* at 5 (emphasis in original).  Dr. Andrews tested plaintiff extensively and opines

that lip reading is not an effective form of communication for plaintiff because she only understands short, superficial statements.  Dr. Andrews opines that lip reading enables plaintiff to understand about 64% of what is being said.  Based on extensive written testing, Dr. Andrews also opines that plaintiff is not fluent in English and does not have the skills to communicate in English in complicated situations with serious consequences.

When she was deposed, plaintiff was employed as a part-time substitute teacher at the Arkansas School for the Deaf.  Plaintiff previously had worked at the Topeka Independent Living Resource Center, where she had an interpreter available to her to help her communicate. Plaintiff also worked for Sprint for many years.  While employed by Sprint, Sprint provided an ASL translator for meetings or other events requiring "important communication."  Doc. 72-3 (Hans Dep. 20:11–19).

### B.    April 3, 2015

#### 1.    Dispatch

On April 3, 2015, plaintiff called 911 emergency from her cellphone.  Shawnee County 911 Dispatch answered the call.  Shawnee County has an Emergency Communications Standard Operating Procedure ("SOP") for handling 911 calls it receives from hearing-impaired callers. This SOP addresses calls placed from Telecommunications Device for the Deaf ("TDD") phones and the Kansas Relay Service.  Despite this SOP, plaintiff was unable to communicate with the dispatcher.

Instead, plaintiff's husband, Raymond Hans, spoke in the background and told the dispatcher that his wife was the one who had dialed 911 and that she is deaf.  Mr. Hans told the dispatcher that he and plaintiff were having a domestic argument and gave the dispatcher the

address of their home.  Mr. Hans also provided his name and plaintiff's name to the dispatcher.
The call then was disconnected.

Shawnee County has an Emergency Communications SOP for telephone procedures.
This SOP instructs the person answering a 911 call that is disconnected to make one attempt to
re-contact the dialing phone.  Consistent with the SOP, the 911 dispatcher called the number
plaintiff had used to call 911 emergency.  The call was answered, and Mr. Hans, again speaking
in the background, informed the dispatcher that plaintiff previously had hung up.  Mr. Hans
informed the 911 dispatcher that he and plaintiff were sitting in a tan Cadillac arguing, but that
officers would find him outside the car when they arrived.  This second call then disconnected.

Plaintiff made several more calls to 911 on April 3, 2015.  Reports from the Shawnee
County dispatch department show that plaintiff placed four 911 calls—calling at 8:45 p.m., 8:47
p.m., 8:48 p.m., and 8:59 p.m.  According to dispatch reports, Mr. Hans told the 911 dispatchers
that his wife wanted to leave but he did not want her to leave because he wanted "to talk about
it."  Doc. 72-4 at 2 (Dispatch Incident Report).

Deputy Justin Dobler and Corporal Jace Beightel from the Shawnee Country Sheriff's
Department were dispatched to the Hans's address at 8:56 p.m.

### 2.      Officers' Interaction

Corporal Beightel arrived at the Hans's residence eight minutes later at 9:04 p.m. and
Deputy Dobler arrived there separately about 10 minutes after Corporal Beightel.  Dispatch had
collected some information from the four 911 calls.  But during their depositions, neither officer
could remember if he had reviewed that information before interacting with plaintiff and Mr.
Hans.  Specifically, Corporal Beightel recalled that he had arrived on scene 10 minutes before

4

Deputy Dobler, but he does not remember if he reviewed the information collected by dispatch while he waited.

The dispatch reports established that:  (1) Mr. Hans and plaintiff were married; (2) plaintiff was deaf; (3) plaintiff had called 911; (4) plaintiff wanted to leave the home and Mr. Hans would not let her leave because he wanted to "talk about it"; (5) Mr. Hans had been drinking; and (6) no weapons were present.  *Id.*

After Corporal Beightel and Deputy Dobler had arrived, they walked toward plaintiff's front door together.  Corporal Beightel activated his body camera.  Deputy Dobler did not have a body camera issued to him at that time because camera usage was still in its initial phases within the Sheriff's Department.  Corporal Beightel's camera recorded footage of several interactions between the officers and plaintiff.[1]

When he responded to this call, Corporal Beightel was suffering from an upset stomach. The first audio captured by Corporal Beightel's body camera recorded him telling Deputy Dobler, "If there's, if there's not charges, I wanna, I . . . we're getting this shit done.  But by the book as well."  When asked what he meant by this, Corporal Beightel explained that "[his] stomach was upset and [he] didn't want to drag things out for longer than they needed to be." Doc. 72-6 (Beightel Dep. 114:4–6).

When the officers reached plaintiff's front door, plaintiff was walking through the entry way and her dogs were barking.  Corporal Beightel opened the glass storm door, stepped inside, and asked plaintiff, "Are the dogs mean?"  Plaintiff quickly turned to face Corporal Beightel and gestured up the stairs.  She then said, "It's ok."

---

[1]    Unless cited otherwise, the court takes the quotes in this subsection from Corporal Beightel's body camera footage, as reproduced in Exhibits 11, 12, and 13 to Document 65.

Corporal Beightel entered the house to speak with Mr. Hans, and Deputy Dobler motioned for plaintiff to step outside with him.  Corporal Beightel's body camera footage suggests that Deputy Dobler interviewed plaintiff twice.  Both times they were alone.  After the two interviews, the officers conferred privately.  And then Deputy Dobler interviewed plaintiff a third time.  Again, they were alone.  While Deputy Dobler spoke to plaintiff alone, Corporal Beightel spoke with Mr. Hans alone.  Then both officers spoke with Mr. Hans and plaintiff, separately.

Initially, Deputy Dobler asked, "What happened?" and plaintiff responded by gesturing that she had pushed Mr. Hans.  Corporal Beightel's body camera footage shows that Deputy Dobler's initial interaction with plaintiff lasted about two minutes and 50 seconds.  Deputy Dobler did not use written notes to communicate during this interaction, but at some point, he wrote at least one note to ask if plaintiff had some place else to go.

Meanwhile, Corporal Beightel spoke with Mr. Hans inside the house.  Right away, Corporal Beightel asked Mr. Hans whether the parties had gotten "physical."  Mr. Hans responded, "She pushed me down in the mud and stomped on my hand but other than that, no sir."  Then, he reported, he got into an argument with plaintiff.  She became upset and left.  When she returned, Mr. Hans reported that he tried to get in her car to leave.  But plaintiff got in the car and called 911.  Mr. Hans again stated, "When I got out, she stomped on my hand, threw me down in the mud."  Mr. Hans told Corporal Beightel several times that plaintiff had pushed him down in the mud and stomped on his hand.  Mr. Hans had visible injuries on the top of his hand.

Corporal Beightel asked Mr. Hans, "Do you wanna file a written statement of what happened?"  Mr. Hans responded, "Uh, if that's what I . . . ."  Corporal Beightel interrupted Mr.

6

Hans and said, "If you do wanna press charges against her, then . . ."  Corporal Beightel later told

Mr. Hans, "You don't have to file a, a written statement is a voluntary statement."

       After speaking with plaintiff the first time, Deputy Dobler interrupted Corporal

Beightel's interview of Mr. Hans to ask if he had keys for the Cadillac.  He responded that he

did, and then Mr. Hans volunteered that plaintiff had the keys for his work truck.  Corporal

Beightel instructed Deputy Dobler to "go ask [plaintiff] if she pushed him down in the mud."

While Deputy Dobler spoke to plaintiff a second time, Corporal Beightel told Mr. Hans, "If she

says that she pushed you down on the ground, that she pushed you, she has to go to jail.  No ifs,

ands, or buts, it's not our choice."  Later, Corporal Beightel reiterated this point:  "If that's what

happened, if she says that's what happened, she's gotta go to jail."  Corporal Beightel then asked

Mr. Hans again, "It's a voluntary statement, do you want to fill one out?  You can say no, you

can say yes."  Mr. Hans then declined to provide a written statement.

       After the second interview with plaintiff, Deputy Dobler returned inside the house and

asked Mr. Hans if he was trying to interfere with plaintiff's vehicle—the Cadillac.  Mr. Hans

responded that he was trying to unscrew the cap on one of the vehicle's tires when plaintiff

approached him from behind and stomped on his hand, breaking through the nail on one finger.

Deputy Dobler interjected.  He said, "She was protecting her property 'cause she thought you

were damaging it . . . ."  Deputy Dobler later commented, "If you came up to my car and I

caught you messing with it, I'd push you away from it, too."

       The officers then conferred privately.  After they conferred, Deputy Dobler spoke to

plaintiff a third time.  This interaction lasted a little longer than one minute.  He asked plaintiff

why she had pushed Mr. Hans down and stepped on his hand.  At the same time Deputy Dobler

was speaking with plaintiff, Corporal Beightel told Mr. Hans that if there was probable cause to

believe that a battery had occurred, Kansas law left them no choice:  They had to take the aggressor to jail.

Then, Deputy Dobler re-entered the house and asked to look at Mr. Hans's hand.  Mr. Hans explained that when plaintiff pushed him over, she came over the top of him and stomped on his hand.  Mr. Hans then said that plaintiff had not stomped on his hand intentionally.

Deputy Dobler explained to Mr. Hans that plaintiff had told him Mr. Hans was letting air out of one of the Cadillac's tires.  As he said this, Deputy Dobler made a rotating motion with his right hand as if he were unscrewing something.  Then, Deputy Dobler explained that plaintiff "went like this"—and he made a sweeping motion with his arms outstretched, palms facing up. Deputy Dobler told Mr. Hans she did this to get him away from the tire.

The officers then spoke with Mr. Hans briefly.  Corporal Beightel and Deputy Dobler discussed whether plaintiff had stepped on Mr. Hans's hand accidentally and, if that was the case, then no battery had occurred.

The officers took the truck keys from plaintiff to give to Mr. Hans, and the Cadillac keys from Mr. Hans to give to plaintiff.  At that point, plaintiff planned to leave the scene so she and Mr. Hans would be separated.

While officers exchanged the keys with Mr. Hans, they told him that he shouldn't allow an argument to reach that point before calling law enforcement.  Mr. Hans responded:

> Yes sir, I get it man.  You guys already arrested me once.  She split my head with a sprinkler, and I was working on my Harley, and I put her against the wall and pulled the sprinkler out of her hand (inaudible).  When you guys showed up, it looked like I had choked her, the grease marks, and I went to jail for that.  So I do understand how it works, I don't wanna go to jail.  That's why when she called you guys when we were sitting in the car and then hung up, I came in the house and called you back.  I knew that was a bad thing, bad, bad.  And I know you guys, you're busy, it's a Friday night, you got better things to do.

8

Ex. 13 to Doc. 65 (Beightel Body Camera Footage at 1:49–2:22).  Then, Mr. Hans reiterated,

"Yeah like I said, after the last time, I learned my lesson, and as soon as she called while we

were in the car, I'm like goddamn I'm going to jail."

When the officers went outside to give plaintiff the keys to the Cadillac, Corporal

Beightel asked plaintiff, "Are you going to go to a friend's house?"  His speech was slow and

deliberate.  Plaintiff responded, "My cousin's."  Plaintiff tried to communicate something else

orally.  Corporal Beightel said, "What?"  Plaintiff tried to communicate orally again.  She then

began to walk in the house.  Corporal Beightel responded, "Hang on.  Yeah, well."  Corporal

Beightel followed her into the house.  Mr. Hans was standing in the entry way and Corporal

Beightel asked, "What does she need?"  Mr. Hans orally asked her what she needed while using

gestures that may have included ASL signs.  He then informed Corporal Beightel that she needed

her suitcase.

After plaintiff collected her bags to leave, Corporal Beightel asked plaintiff, "Do you

understand you were this close to going to jail?"  Again, his speech was slow and deliberate.

And he used gestures as he asked the question.  While he was saying "you" he pointed at

plaintiff.  And while he said "this close" he held his right index finger and thumb less than an

inch apart.  Plaintiff responded, "Me, why?"

Then, plaintiff communicated by speaking and gesturing that Mr. Hans was trying to let

the air out of her tires.  She raised her leg and made a downward gesture with it—seemingly

reenacting a kick or push with the bottom of her foot.  She then told the officers that Mr. Hans

threw something at her eye.  She tried to communicate something else orally and Corporal

Beightel responded, "Huh?"

Plaintiff then walked down the driveway to the Cadillac.  As she walked, she tried to communicate orally with the two officers.  Neither one responded.  Once plaintiff reached the Cadillac, she gestured by the front passenger-side fender in a manner consistent with someone letting air out of the front tire, followed by a kicking motion and a gesture suggesting a two-handed push.  She then walked around the front of the car and picked up a dog bone, saying and gesturing that Mr. Hans had hit her in the eye with the bone.  Corporal Beightel asked plaintiff, "Did it hit you?"  Plaintiff responded, "It did" and pointed to her left eye.[2]

After plaintiff's interaction with the officers near the Cadillac, Deputy Dobler decided to arrest plaintiff for Domestic Battery.  Deputy Dobler construed her actions as ones reenacting conduct where she had kicked and pushed Mr. Hans.  He said plaintiff was "emotional," and he interpreted her actions as a "stomp, kick, and push" that "without a doubt" were intentional. Doc. 72-5 (Dobler Dep. 60:11–61:5, 68:8–13).  Deputy Dobler did not arrest plaintiff for pushing Mr. Hans.  Instead, he explained, he decided to arrest her for "stepping" on Mr. Hans and kicking him.  *Id.* (94:22–95:2).

Corporal Beightel did not interpret any of plaintiff's gestures to communicate that she had stomped on Mr. Hans's hand.  But, he said, he understood her gestures to amount to an admission that she had kicked Mr. Hans, and this admission established probable cause for the officers to arrest her.

After plaintiff alleged that Mr. Hans had thrown a dog bone at her, Corporal Beightel revisited Mr. Hans inside and asked him whether he threw anything at plaintiff.  Mr. Hans denied that he had done so.  Corporal Beightel then told Mr. Hans:

---

[2]    During this interaction with the officers, plaintiff tried to communicate with them orally.  But during the officers' later review of the body camera footage, the officers could not understand several aspects of what plaintiff was trying to say.

> She's going to jail.  She's going to jail.  She told us you threw something, hit her
> in the eye.  What she did, after she, it was explained that she may go to jail, was
> a different description than what she said the first time.  So, she's going to jail.
> Um, she won't be able to call you tonight, so you guys will be separated for the
> night.  Do you have any questions for me?

Ex. 13 to Doc. 65 (Beightel Body Camera Footage at 7:50–8:17).

Corporal Beightel then walked back down the driveway to the Cadillac.  He instructed

plaintiff to get her purse and bring it with her as she was headed to jail.  As he said this to

plaintiff, he made a waving motion toward his body with both hands.  Plaintiff reached into the

Cadillac and picked up her purse.  Corporal Beightel also asked plaintiff if she had her keys.  She

looked in her purse, pulled out her keys, and showed them to Corporal Beightel.

Deputy Dobler then told plaintiff, "If you stay cooperative, I'll put the cuffs in front and

not in back, deal?"  Deputy Dobler used gestures as he spoke.  As he said "you" he pointed at

plaintiff.  As he said "in front," he held his wrists together in front of his body.  And as he said

"in back," he held his wrists together behind his body.  Plaintiff responded, "Okay" and held her

wrists up in front of her body.  Deputy Dobler then placed plaintiff under arrest and handcuffed

her, with her arms in front of her body.

The entire interaction at the house among plaintiff, her husband, and the two officers

lasted about 30 minutes.  Plaintiff never asked for a sign language interpreter during this

interaction.  She now claims that she believes it was the officers' job to provide an interpreter.

Dr. Andrews, plaintiff's expert, opines that plaintiff, to understand what was happening and to

ensure adequate communication during the process, needed a qualified ASL interpreter.

Deputy Dobler transported plaintiff to the Shawnee County DOC in his patrol car.  He

did not communicate with her during this transport.

The District Attorney declined to pursue criminal charges against plaintiff noting, "There is insufficient evidence of a criminal offense." Doc. 72-7.

### 3.    Plaintiff's Description of the April 3, 2015 Arrest

At her deposition, plaintiff testified about the entire incident leading to her arrest. An ASL interpreter assisted her during this deposition. Plaintiff took about 30 minutes to describe the events. Her version of the events follows.

On April 3, 2015, plaintiff and Mr. Hans were having an argument at their home. She tried to leave but Mr. Hans took the keys to their Cadillac. So plaintiff grabbed the keys to their truck. After plaintiff grabbed the truck keys, Mr. Hans got in the Cadillac and backed out to block the truck, presumably so that plaintiff could not leave in it.

Plaintiff jumped in the Cadillac and called 911. Plaintiff called 911 because she wanted the Cadillac keys back. She also felt like she was in danger because Mr. Hans was really, really mad and had been drinking. By this point, the parties had engaged in no physical contact.

After her calls to 911, Mr. Hans told plaintiff, "[T]he cops are on the way." Doc. 72-3 (Hans Dep. 57:17). Mr. Hans then got out of the Cadillac and opened the hood. Plaintiff did not know what he was doing, but she suspected he was messing with the car's wiring. She got out of the car and closed the hood.

After plaintiff closed the hood, Mr. Hans found "something" and threw it at plaintiff's face, striking her. *Id.* (57:23–25). Plaintiff had no idea what Mr. Hans threw at her. Then, Mr. Hans went to the garage and retrieved a tool. He then tried to bleed air out of the Cadillac's tires.

Plaintiff concedes that when Mr. Hans tried to drain air out of the Cadillac's tires, she tried to push him away from the tire. First, she said, she used her hands to push him. When he got back up and tried again to drain air out of the tire, she put her foot on his buttocks and pushed

12

him.  Plaintiff characterized this conduct as a "push"—and not a kick.  *Id.* (56:24–25).  She said

that Mr. Hans had so much to drink that he tipped over easily.  She barely had to push him.

Mr. Hans was on his hands and knees on the ground.  And plaintiff was behind him.  She

did not stomp on his hand.  But plaintiff told Dr. Jean Andrews, her expert, that she stepped on

one of his fingers, albeit accidentally.

After the altercation by the Cadillac's tire, both plaintiff and Mr. Hans went back inside

their home and waited for police to arrive.  Plaintiff waited near the front door of her home.

### C.      Shawnee County Department of Corrections

After arresting her, Deputy Dobler transported plaintiff to the Shawnee County DOC.

When plaintiff arrived there at 10:20 p.m., former Shawnee County corrections officer Angelica

Hutting booked plaintiff into the facility.  Officer Hutting lacks an independent recollection of

booking plaintiff into the facility.  But, she testified about her usual practice for booking a

hearing-impaired individual in the DOC.  Officer Hutting explained that if she experienced

difficulty communicating with a deaf person, she used a combination of written notes and written

forms that the arrestee could use to follow along.  Officer Hutting also knew that Shawnee

County had access to interpreters.  She explained that she involved interpreters if she thought the

inmate was not comprehending.  Plaintiff recalls that Officer Hutting used written materials to

cover the intake questions.

### 1.      Screening

All inmates processed into the DOC are screened for the risk of suicide.  Following this

screening process, the DOC can place an inmate in general population (low risk), close

observation (moderate risk), or on suicide watch (elevated risk).  Officer Hutting conducted the

plaintiff's initial screening.  Following the screening, Officer Hutting prepared an Officer's

Report Sheet about plaintiff. The report provides, "Subject was booked in for domestic battery. Subject indicated that she feels 'a little bit' hopeless and helpless. Subject takes medication for depression. This is Subject's first arrest." Doc. 72-22. When asked where she got the information to write that plaintiff felt "a little bit" hopeless and helpless, Officer Hutting did not recall. She volunteered that her "best guess" is that plaintiff wrote that down on her printed copy of the questions. Doc. 72-8 (Hutting Dep. 74:17–22).

Officer Hutting prepared the report sheet based on her initial screening of plaintiff. Plaintiff's initial screening questionnaire provides, in part:

Initial Classification Suicide Questions
1. Ever Attempted Suicide?                    No
2. Had thoughts of hurting yourself?         No
3. Thinking of hurting yourself now?         No
4. How would you attempt suicide?          No
5. Do you have means to do so now?        No
6. Recent loss/death of loved one?          No

Initial Classification Victimization Questions
1. Is inmate/juvenile particularly small?     Yes     Depression
2. Past child abuser (Juvenile = abuse victim)?   Yes
3. Is inmate/juvenile effeminate?           Yes     A little bit
4. Other reason for protective custody?      No

Initial Classification Mental Health Questions
1. Diag. Mental Illness? (Include family of juvenile)    No
2. Taking Psychotropic Medication?         No
3. Past in-patient MH care? (include family of Juv.)   No
4. Are You Feeling Helpless and Hopeless Presently?   No
5. Have You Ever or Are You Presently Hearing Voices?   No

Doc. 72-9 at 1. When asked why the questionnaire does not report that plaintiff said she felt a little bit helpless or hopeless, Officer Hutting explained:

It appears as though I entered the responses to the questions for the mental health questions I entered as responses to the questions for victimization questions. It also appears as though I may have entered the responses for the victimization questions into the field for the responses for the mental health questions.

14

Doc. 72-8 (Hutting Dep. 71:17–23).

But when one switches the answers to the two groups of screening questions, the answer to the question, "Are you feeling helpless and hopeless presently?" still does not line up with "yes," "a little bit."  That is, the "helpless and hopeless question" is the fourth question in its sequence and the "yes[,] a little bit" answer is listed as an answer for the third question in its group.  When asked about this alignment, Officer Hutting explained, "It appears as though I made a mistake in where I entered that information."  *Id.* (73:8–9).

Based on Officer Hutting's responses in the initial screening questionnaire, Sergeant Anderson came to the DOC book-in area to conduct a suicide screening of plaintiff.  Sergeant Anderson conducted her screening using the DOC's screening form.  Dr. Andrew White, an expert consultant in jail and prison suicides, helped the DOC construct this screening form.

To complete plaintiff's suicide screening and intake form, Sergeant Anderson and plaintiff sat side-by-side at a computer screen.  Sergeant Anderson pointed to each question, and plaintiff then read the question silently.  Plaintiff would respond yes or no, and Sergeant Anderson would type her response into the computer.  If Sergeant Anderson didn't understand her answer, he directed her to write her answer down.  Sergeant Anderson recalls using notes to communicate with plaintiff when he did not understand her.  But he testified that he had discarded those notes.

Plaintiff had been taking medication for depression for many years before the events of April 3, 2015.  When she was arrested, plaintiff was taking Effexor, a medication she said she used to treat depression.  And within the year immediately before her April 3, 2015 arrest, plaintiff had been hospitalized for depression for three days.  Plaintiff told Sergeant Anderson in

15

writing that she had been hospitalized at Valeo in the past year for psychiatric care and treatment. She also wrote down her list of medications.

Sergeant Anderson knew that the jail had an interpreter for non-English speaking individuals. Specifically, Sergeant Anderson said, "If the communication barrier is there, I will get someone to get the communication there." Doc. 72-10 (Anderson Dep. 80:19–20). But he never has had a communication barrier with a hearing-impaired inmate and thus never has called in a sign language interpreter during DOC's admission process. He added, "If they request it then I will sure get one." *Id.* (81:4–5). It is not clear whether Sergeant Anderson was speaking hypothetically.

In response to the Screening Form's question that asks, "Does the inmate feel that there is nothing to look forward to (expresses feelings of hopelessness)?," Sergeant Anderson recorded plaintiff's response as: "A little bit." Plaintiff gestured and used facial expressions to respond to this question. She explained, "Those were his words that he wrote down." Doc. 72-3 (Hans Dep. 75:10–11). When asked on follow up, "So you did not say, a little bit?," Plaintiff reiterated, "No. I didn't say a little bit. There was no interpreter or anything. There was no written notes. It was just this form and pointing to him. So, I was doing my best." *Id.* (75:13–16). When asked a third time, plaintiff again explained, "I just showed a gesture that—that—just that exasperation . . . I was in shock, I don't know. That was my expression to him, my gesturing to him." *Id.* (76:4–9).

The answer column for this Screening Form question contains a bold outlined box. This bold outline indicates that a positive answer to this question requires an automatic suicide watch placement. Dr. White's expert report opines:

> Hopelessness is a clinically accepted factor relevant to the assessment of suicide risk and as such, is fully appropriate for placement in a screening instrument.

> Including it on the screening form is based not only on the clinical significance of the concept, but also on [the DOC's] goal to develop a comprehensive, conservative assessment tool that minimizes offender risk . . . identifying Hopelessness as a mandatory requirement for suicide watch placement is reasonable and prudent as well as within the discretion of administrators, given that the instrument was of use by correctional officers as a first-line screening tool.

Doc. 65-23 at 12 (White Report).

The DOC policy provides, "if any of the double line outline boxes in the 'Yes' column have been checked but no bold-outline boxes, the screener shall at least place the inmate on Close Observation status, unless the combination of boxes checked indicates that the inmate needs to be placed on Suicide Watch." Doc. 65-22. Even when none of the bold or double line outline boxes on the suicide screening form are checked, the screener still has authority to make a judgment call about appropriate placement. This includes placing the inmate on Close Observation or even Suicide Watch status.

Plaintiff's response to the form's question, "Does the inmate feel that there is nothing to look forward to (expresses feelings of hopelessness)?" was the main reason Sergeant Anderson concluded he should place plaintiff on suicide watch. He identified other reasons as well: It was her first arrest, her charges were for domestic battery, and she had a history of depression. Dr. White's report also opines:

> [Sergeant] Anderson's interactions with Ms. Hans were conducted in a professional and well intentioned manner that enabled him to complete the assessment. When he was directly asked about the mandatory suicide placement item, he indicated that given the totality and seriousness of her "yes" responses to the questionnaire items (two mandatory close observation items, one mandatory suicide watch, one domestic crime, a battery offense (Violence), previous hospitalization for Depression, currently on medication for Depression, and first arrest) he would have taken the precaution of placing her on suicide watch. Under the circumstances, Sgt. Anderson's decision, in my judgment, was reasonable and prudent and clearly was within the scope of his duties and responsibilities, as well as in Ms. Hans's best interest.

Doc. 65-23 at 10 (White Report).  Finally, Dr. White opines:

> [E]ven though Ms. Hans indicated she was not currently thinking of killing herself, it is well known that people contemplating suicide do not always tell the truth when asked and/or subsequently change their mind or even make an impulsive attempt with little or no warning.  As such, correctional personnel, particularly supervisory officials, are encouraged and authorized to use their experience and judgment to make decisions about the well-being of an offender when they have sufficient reason to do so.  In my view, that is exactly what Sgt. Anderson did when he placed Ms. Hans on suicide watch, which he apparently could have done based on other items on the questionnaire, regardless of the Hopelessness item's mandatory placement requirement.

*Id.* at 12.

Once Sergeant Anderson completed plaintiff's suicide screening, Michael Adams, a medical nurse employed by Corizon, conducting a medical screening.  When Mr. Adams asked plaintiff the same screening questions that Sergeant Anderson and Officer Hutting had asked her, some of plaintiff's answers contradicted the answers that Officer Hutting and Sergeant Anderson had recorded.  Specifically, Mr. Adams recorded plaintiff's answer to the helpless/hopeless question as "no."

### 2.      Strip Search and Jail Cell

After the medical screening, a female officer strip-searched plaintiff.  Officer Hutting filled out a "Strip Search Form" for plaintiff.  The form provides multiple reasons why a strip search may be warranted.  Officer Hutting marked a box labeled:  "The arrestee has recently attempted or threatened suicide or has a known history of suicide attempts or threats."  Doc. 72-23 (Strip Search Form).

When asked about the form and the box she had checked on it, Officer Hutting explained:

> That would be the box that we would check if the person screened out on to suicide watch.  It's not worded very well on this document, but there is no box to check for a person indicating that they feel hopeless or helpless.  So, this is the closest related box that would be indicated.

18

Doc. 72-8 (Hutting Dep. 96:15–20).  Officer Hutting also explained that when a person was placed on suicide watch, officers automatically perform a strip search of that person.

Following her strip search, plaintiff was issued an anti-suicide smock.  Plaintiff's smock did not fit her properly so she also was given an anti-suicide blanket.  At 1:05 a.m. on April 4, 2015, plaintiff entered her cell.

When plaintiff first arrived at the DOC, she could communicate by written notes.  But once she was in her cell, she had to gesture to request things.  For example, she gestured that she had to urinate so she was provided toilet paper.  She also requested water by gesturing.

Plaintiff never requested a sign language interpreter from anyone at the DOC.  Dr. Andrews, plaintiff's expert, opines that plaintiff needed a qualified ASL interpreter to understand what was happening during DOC's booking process and to ensure adequate communication during that process.

### 3.    Release

The next afternoon, April 4, 2015 at 2:53 p.m., Shawnee County, Kansas District Court Judge Kingfisher conducted a bond review and completed a probable cause determination form. Judge Kingfisher determined probable cause existed for plaintiff's arrest and set plaintiff's bond at $5,000 cash or professional surety.  Judge Kingfisher ordered, as a condition of bond, that plaintiff report to Court Services immediately upon release.

Bond was posted by Back Out Bail Bonds.  About an hour later, at 4:00 p.m. on April 4, plaintiff was removed from her cell.  Corrections Officer Jeannie Vincent then booked plaintiff out of the DOC facility and released her at 4:30 p.m.

At discharge, the bond paperwork—including Judge Kingfisher's bond conditions containing the requirement for plaintiff to report to Court Services immediately upon release—

was provided to plaintiff in writing.[3]  The bond company also told plaintiff that she would need

to meet with a Court Services Officer ("CSO").  Plaintiff ultimately attended the meeting with

her CSO, Mary Herman.[4]  They communicated using written notes.  No interpreter was

provided.[5]

### D.    Shawnee County Department of Corrections Memorandum

In response to a complaint plaintiff filed, Matt Biltoft, a 19-year employee of the

Shawnee County Department of Corrections, was tasked with creating a timeline of plaintiff's

booking process at the DOC.  Mr. Biltoft once worked as a corrections specialist, but now works

as an intelligence and investigations officer.

Mr. Biltoft spoke with Sergeant Anderson about his interaction with plaintiff.  Of note,

Sergeant Anderson told Matt Biltoft that plaintiff could read lips.  Mr. Biltoft relied on Sergeant

Anderson's representation.

When preparing his report, Mr. Biltoft did not interview Nurse Adams about the intake

questionnaire he had prepared or its answer contradicting Sergeant Anderson's suicide screening.

He also did not interview Officer Hutting about the errors in the intake questionnaire she had

completed.  Nor did he make any notes highlighting the inconsistencies among the reports

prepared by Officer Hutting, Sergeant Anderson, and Nurse Adams.  Mr. Biltoft completed his

report in two days and submitted it to his supervisor.

Later, during a deposition, Mr. Biltoft described his knowledge and training.  For non-

English speaking inmates, Shawnee County uses a service called "Language Line" that has

---

[3]    No DOC employee has authority or ability to make arrests.

[4]    Court Services Officer Mary Herman is an employee of the State of Kansas, not Shawnee County.
Court Services is a department of the State of Kansas, not Shawnee County.

[5]    No DOC employee has the authority to determine or arrange for aids or services to be provided at a
meeting with a CSO.

training and pamphlets available to jail staff.  This service can provide translation over the phone

and also offers ASL interpreters for in-person support.  Mr. Biltoft did not recall attending a

specific class about hearing-impaired individuals, but he had received on-the-job training.  Mr.

Biltoft also explained that the County had policies about the Americans with Disabilities Act.

But he was not sure whether those policies or his training covered the legal requirements of the

ADA.

**E.     September 25, 2015**

Almost six months after her arrest, plaintiff contacted Shawnee County 911 dispatch

using a relay service.  She initiated this call on September 25, 2015.  She told the dispatcher that

she wanted to file a report for domestic battery.  The dispatcher advised plaintiff that a Topeka

Police officer would respond to her call, in person, unless she preferred to come to the Topeka

police station to file a report.  Plaintiff informed the dispatcher that she would need an interpreter

so she thought it best for her to come to the station where she could use the relay service on her

phone.  The dispatcher agreed to the approach proposed by plaintiff.

After more conversation, plaintiff told the dispatcher the location of the alleged battery,

and the dispatcher told plaintiff she would need a Shawnee County Sheriff's deputy to respond in

person or a deputy could meet her at the same station, but in another wing of the police station.

Plaintiff asked to meet the deputy at the station, and the dispatcher again agreed.  The dispatcher

then asked plaintiff's name, her phone number, the suspect's name, and the type of car she would

be driving to the station.  The dispatcher asked to confirm that plaintiff could use the video relay

service on her phone.  Plaintiff responded "yes" to this question.  Plaintiff also told the

dispatcher, "Usually that's not allowed, but for an emergency situation it is allowed, and this is

an emergency, so I will go ahead and use Convo Relay as a video relay interpreter on my

21

iPhone." Ex. 30 to Doc. 65 (Audio recording of plaintiff's September 25, 2015 phone call).  The

dispatcher then gave plaintiff directions to the Shawnee County Sheriff's location at the Law

Enforcement Center.  Shawnee County Sheriff's Officer Brett Butell waited nearly 45 minutes

for plaintiff to arrive at the Law Enforcement Center.  But she never appeared.

      **F.**      **Shawnee County Policies and Training**

The Shawnee County Sheriff's Department has a policy informing its officers how to

handle and process domestic violence calls.  This policy, along with all Sheriff's Department

policies, are provided to the officers in training and they can access the policies on the computers

located in their patrol cars.

The domestic violence policy provides, in part:

III. B. Responding Officers' Responsibilities:

> 1. Whenever officers investigate a domestic violence call, they **shall** investigate the situation thoroughly in the same manner expected of other cases, in order to determine the appropriate response to be taken.

> 2. In domestic violence situations, the responding officers **should**, to the extent of the available time and resources, do the following:

>> a) Receiving the Call:

>>> (1) Officers should begin compiling information to formulate a plan of action that will minimize the risk to responding officers and affected citizens.

>>> . . .

>> f) Assessing the Situation:

>>> (1) If the victim sustained any obvious and visible injuries or if there is property damage, photographs should be taken.

>>> . . .

(5) The investigation should include written statements from the victim and witnesses, if possible.

(6) Where possible, a written statement should be obtained from any suspect while considering safety factors and Miranda issues.

. . .

g) Determining the Action to be Taken:

. . .

(2) While injury is at least one of the stronger "building blocks" of probable cause, it is not necessary for the victim to have been injured to establish the existence of probable cause.

(3) In cases where there are unsubstantiated allegations of violence, a victim's willingness to make a statement, preferably in writing, may be used as a part of the overall probable cause development.

(4) It is up to the responding officers to determine whether none, one or both of the participants are arrested when both participants accuse the other of domestic violence.

(a) Officers should make a probable cause determination as to whether one of the parties can be labeled the "primary physical aggressor" who causes the other to commit "defensive combat" only.

(b) Or whether both parties instigated domestic violence.

(c) When determining whether a subject's actions were "defensive combat", officers should consider K.S.A. 21-5222 (Use of Force in Defense of a Person), which states:

(i) A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another

23

against such aggressor's imminent use of unlawful force.

(5) The statements of each party and any witnesses should be evaluated independently along with the available evidence and other observations made by the officers, probable cause determined, and appropriate action taken consistent with this policy.

Doc. 72-15 at 2–4 (emphasis added).

Both Corporal Beightel and Deputy Dobler recalled receiving training about domestic violence situations. Corporal Beightel did not recall if that training had included a review of Shawnee County's domestic violence policy. But Deputy Dobler explained that his training covered the policies addressing that topic.

On the distinction between the policy's use of the word "shall" and "should," Deputy Dobler clarified, "Should is suggest and shall is you have no discretion." Doc. 78-3 (Dobler Dep. 170:13–15). Corporal Beightel also explained that "should" in policies provides officers discretion.

The Shawnee County Sheriff's Department also has a policy governing its officers' conduct in situations when a person has limited English speaking proficiency.

This policy provides in relevant part:

III. PROCEDURE

A. Identification of Primary Language

1. SNSO personnel should avoid assumptions about an individual's primary language.

. . .

B. Interpreter Services

. . .

24

> 2. Family members . . . should not be used for interpretations,
> especially for communications involving witnesses, victims and
> potential suspects . . . except temporarily in unforeseen, emergency
> circumstances while awaiting professional interpretation . . . .

Doc. 72-16 at 1–2.

When asked about plaintiff's primary language, Deputy Dobler stated that he understood

he should not make assumptions.  On the day of plaintiff's arrest, he couldn't recall if plaintiff's

primary language had crossed his mind.  He "just went with what was effective."  Doc. 72-5 at

33 (Dobler Dep. 180:8–9).  Corporal Beightel thinks plaintiff's primary language is English.

Both Deputy Dobler and Corporal Beightel know that the 911 dispatcher has resources

and interpreters available for officers to use on calls.  Deputy Dobler believes that if:  (1) the

scene is safe and (2) time isn't an issue, then it is appropriate to call the dispatcher when a

communication barrier exists.  Deputy Dobler explained that he would defer to the dispatcher to

get help if he experienced a problem communicating with someone at the scene.  Corporal

Beightel believes that if he responds to a call and he cannot communicate effectively there, he

can call and ask for a translator.  Corporal Beightel also knows that he should not use family

members to translate at the scene of a call.

When a person involved at the scene of a response to a 911 call does not speak English,

Deputy Dobler uses his common sense.  He uses the Topeka Police Department for translation

with Spanish-speaking individuals.  Corporal Beightel has no training about working with non-

English speaking individuals.

Both Deputy Dobler and Corporal Beightel do not recall any training about working with

hearing-impaired citizens.  Before dealing with plaintiff in April 2015, Deputy Dobler testified,

initially, that he never had dealt with a deaf person in his work as a deputy.  But later, he recalled

one traffic encounter with someone he knew from his childhood.  He said he knew that person

was deaf.  Deputy Dobler does not have an understanding nor has he received training about the requirements of Title II of the ADA.

Defendants have received just one other complaint in the last 10 years asserting that they failed to accommodate a disabled inmate.  They received it on October 26, 2016—after plaintiff filed this lawsuit.  The Kansas Human Rights Commission dismissed that complaint.

### G.    Shawnee County Sheriff's Department Arrest Report and Affidavits

Deputy Dobler and Corporal Beightel testified about the reports and affidavits they completed on the Hans call in April 2015.   Deputy Dobler explained that the reports contain errors due to the flaws in the reporting system and issues that arise when reports are merged and sent to Records.  Also, certain state requirements lead records clerks to provide information in the reports that the officers may not have entered.

Deputy Dobler believes that Corporal Beightel's narrative report provided an incorrect timeline and inaccurately recounted some statements.  Specifically, he believes the report failed to memorialize properly that Mr. Hans initially accused plaintiff of stomping on his hand intentionally.  Also, Corporal Beightel's affidavit reported that plaintiff said nothing about stepping on Mr. Hans's hand.  Deputy Dobler disagreed with this portion of the affidavit, testifying that plaintiff showed him and Corporal Beightel that she had stomped on Mr. Hans's hand.

Corporal Beightel conceded that his own report was incorrect in several places.  The report failed to mention the act of plaintiff "stomping" on Mr. Hans's hand.  And the report summarized some events in the wrong order.  When asked about the language in his affidavit, Corporal Beightel said that his description could "be worded better."  Doc. 72-6 (Beightel Dep. 99:25).

26

## II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof."  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at

670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

**III.    Analysis**

Defendants argue they are entitled to summary judgment against all plaintiff's claims.

The court organizes its analysis of defendants' arguments in three sections.  The first portion—

Part A, below—address plaintiff's claim under § 1983.  The second part of the analysis—in part

B—takes up plaintiff's ADA claim.  And last, Part C addresses plaintiff's three causes of action

relying on Kansas state law.

**A.    Section 1983 Claim**

Plaintiff alleges that both defendants violated 42 U.S.C. § 1983 when their employees

wrongfully arrested her.  Doc. 56 at 11 ¶ 8.  "A plaintiff may recover damages under § 1983 for

wrongful arrest if she shows she was arrested without probable cause." *Cottrell v. Kaysville

City, Utah*, 994 F.2d 730, 733 (10th Cir. 1993).  "Probable cause exists when the facts and

circumstances within the officers' knowledge, and of which they have reasonably trustworthy

information, are sufficient in themselves to warrant a man of reasonable caution in the belief that

an offense has been or is being committed and that the person . . . was involved in the crime."

*Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017).  "The probable cause determination is based

on the totality of circumstances . . . and 'does not . . . require the suspect's guilt to be more likely

true than false.'" *Pinney v. City of Tulsa, Okla.*, No. 16-5171, 2017 WL 5643119, at *2 (10th

Cir. Nov. 24, 2017) (first citing *Florida v. Harris*, 568 U.S. 237, 244, (2013); then quoting

28

*Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014)).  "The question is whether a reasonable officer would have concluded that the [plaintiff] 'committed a crime.'"  *Id.* (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).  The court reviews the facts as the officers knew them.  *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (citation omitted)).

When the officers arrested plaintiff, Kan. Stat. Ann. § 21-5414 defined domestic battery as "(1) [k]nowingly or recklessly causing bodily harm by a family member or household member against a family or household member; or (2) knowingly causing physical contact with a family or household member by a family or household member when done in a rude, insulting or angry manner."

These principles merge with the legal standard for summary judgment.  When determining whether probable cause existed for the purportedly unlawful arrest, the court reviews "the facts known to the arresting officer at the time of the arrest."  *Alford*, 543 U.S. at 152.  And probable cause existed if those facts, viewed in "the totality of the circumstances," *Pinney*, 2017 WL 5643119, at *2, would lead "a man of reasonable caution" to believe "an offense has been committed."  *Patel*, 849 F.3d at 981.  When determining if summary judgment is warranted, the court views the facts "in the light most favorable to the non-moving party," *Nahno-Lopez*, 625 F.3d at 1283, to determine if a "genuine dispute" exists about "any material fact."  Fed. R. Civ. P. 56(c).

At bottom, these standards require the court to determine if probable cause existed for plaintiff's arrest by viewing the facts known to the arresting officers at the time they made the

arrest as judged by the totality of the circumstances. The court must view these facts, of course, in the light most favorable to plaintiff.

So, defendants' motion requires the court to decide whether, on the summary judgment facts, a reasonable jury could find that defendants' employees lacked probable cause to arrest plaintiff on a domestic battery charge. Or, to put a finer point on the governing question, could a reasonable jury find that a reasonable officer lacked a basis to conclude that plaintiff knowingly caused physical contact with a family or household member in a "rude, insulting, or angry manner?" *See* Kan. Stat. Ann. § 21-5414.

It comes as no surprise that various witnesses' recollections about a domestic dispute involving a family member who had been drinking heavily comes with some factual differences. But all the facts that govern the officers' probable cause determination are settled ones. In short, none of the material facts are disputed.

For one, no one disputes that Mr. Hans was plaintiff's "family or household member." This satisfies the first component of a charge under Kan. Stat. Ann. § 21-5414(2). Likewise, no one disputes that plaintiff "knowingly caus[ed] physical contact" with Mr. Hans. She has admitted as much. She gestured to Deputy Dobler that she had pushed Mr. Hans. Later, she reenacted something else she had done, showing how she had used the bottom of her foot to make contact with Mr. Hans. A few seconds later, she reenacted the foot contact a second time; and she also demonstrated that she had used her hands to make contact with Mr. Hans.[6]

But plaintiff's admissions were not the only "facts and circumstances within the [arresting] officers' knowledge." *Patel*, 849 F.3d at 981. Nor were they the only "reasonably trustworthy information" the officers received before arresting plaintiff. *Id.* Mr. Hans confirmed

---

[6]   Plaintiff calls the contact with her foot a "push," while the officers viewed it as a kick. But that distinction doesn't matter. The operative portion of the Kansas statute criminalizing domestic battery merely requires "physical contact" made in a rude, insulting, or angry manner.

that plaintiff had pushed him and then, he asserted that plaintiff "had stomped" on his hand.  And although Mr. Hans later retracted the stomping allegation, the officers observed visible injuries on the top of Mr. Hans's hand.  Given the "totality of the circumstances," *Pinney*, 2017 WL 5643119, at *2, no reasonable jury could find that the defendants' employees lacked probable cause to believe plaintiff had "caus[ed] physical contact" with her family member.

This leaves just one more component of the probable cause analysis.  Could the officers reasonably have concluded that plaintiff made contact with Mr. Hans in either a "rude, insulting, or angry manner?"  Kan. Stat. Ann. § 21-5414(2).  The summary judgment facts leave no room for dispute whether the officers had a reasoned basis for their determination on this front. Plaintiff and her husband both reported that they had engaged in a sufficiently serious disagreement that plaintiff elected to request law enforcement officers to come to the scene.  And while a factfinder ultimately may have concluded that plaintiff's pushing and kicking was neither rude nor insulting nor angry, that is not what controls the probable cause analysis.  As the Circuit has emphasized, probable cause exists when "reasonably trustworthy information" would lead an officer of "reasonable caution" to believe that plaintiff committed domestic battery.  *Patel*, 849 F.3d at 981.  No reasonable jury could find that Corporal Beightel and Deputy Dobler lacked probable cause to arrest plaintiff.

The court closes its analysis with two more observations about the summary judgment facts.  First, the reasoned quality of the officer's conclusion later was confirmed by a Kansas state court judge.  The parties all agree:  Shawnee County, Kansas District Court Judge Kingfisher conducted a bond review and probable cause determination the day after plaintiff's arrest.  The parties also agree Judge Kingfisher concluded that probable cause supported plaintiff's arrest.  This judicial determination bolstered the officers' determination.

Finally, plaintiff contends that her § 1983 claim must survive summary judgment because the Kansas prosecutor decided not to prosecute plaintiff for domestic battery.  This argument confuses two distinct analyses.  As our Circuit has explained, "Since probable cause for a warrantless arrest is determined in terms of the circumstances confronting the arresting officer at the time of the seizure, the validity of such an arrest is not undermined by subsequent events in the suspect's criminal prosecution, such as dismissal of charges, or acquittal."  *Summers v. State of Utah*, 927 F.2d 1165, 1166–67 (10th Cir. 1991).  The court thus analyzes the circumstances at the time of plaintiff's arrest—not the ones that later controlled a district attorney's decision not to prosecute plaintiff.

For these reasons, the court finds that no reasonable jury could conclude that the two officers lacked probable cause to arrest plaintiff.  Consequently, the court grants defendants summary judgment against plaintiff's § 1983 claim.[7]

### B.  ADA Claims

Plaintiff also asserts that both defendants violated Title II of the ADA by failing to accommodate her disability in eight different ways.  They allegedly committed these violations by:  (1) failing to provide the services of an appropriate response when she called 911 on April 3, 2015; (2) wrongfully arresting plaintiff; (3) improperly communicating with her during the intake process at the DOC and incorrectly subjecting her to suicide watch; (4) denying her access to an interpreter when she bonded out of the jail; (5) denying her access to a sign language interpreter for her meeting with Mary Herman, her Court Services Officer; (6) threatening plaintiff with re-arrest if she did not meet with Mary Herman, her CSO, despite denying her request for a sign language interpreter for the meeting; (7) failing to train their employees

---

[7]   Because the court reaches this conclusion, it does not address defendants' argument that a § 1983 claim against both defendants is redundant.  *See* Doc. 65 at 21.

appropriately about how to comply with the ADA; and (8) failing to supervise their employees to ensure compliance with their own policies or the ADA.  The court does not decide whether a genuine issue of material fact exists about plaintiff's ability to make a submissible case on these claims because the court determines that plaintiff cannot recover compensatory damages under Title II of the ADA without establishing intentional discrimination.  And plaintiff has waived the opportunity to assert intentional discrimination by omitting that claim from the Pretrial Order. Also, even if plaintiff had not waived her right to assert this claim, she has failed to establish facts from which a reasonable jury could find that defendants intentionally discriminated against her.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To make a viable claim under Title II, a plaintiff must prove:

> (1) that he or she is a qualified individual with a disability;
> (2) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
> (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016).  "Based on the second element, courts have recognized two types of claims:  (1) exclusion from or denial of benefits and (2) discrimination."  *Id.* (citation omitted).  "Courts have recognized three ways to establish a discrimination claim:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  *Id.* (citations omitted).

Here, all plaintiff's theories assert that defendants failed to make a reasonable accommodation.  Out of the gate, defendants argue that plaintiff's reliance on their failure to

accommodate her disability affects her claim in two ways, and entitles them to summary judgment.  First, defendants argue, plaintiff has waived any claim of intentional discrimination and discrimination by disparate impact because she didn't include either of those claims in the Pretrial Order.  And second, plaintiff cannot recover compensatory damages under Title II of the ADA without showing intentional discrimination and she fails to show intentional discrimination.  The next four subsections analyze these arguments.

## 1.      Waiver

First, defendants contend, plaintiff is precluded from asserting intentional discrimination or discrimination through disparate impact.  For this argument, defendants solely rely on *J.V. v. Albuquerque Public Schools*.

In this case, our Circuit affirmed a district court's decision to grant summary judgment because plaintiffs had waived a disparate impact argument by failing to include it in their Complaint.  *Id.* at 1299.  The district court decided to grant defendant summary judgment because first, plaintiffs had waited until they filed their response to defendant's motion for summary judgment before asserting that defendant's conduct was discriminatory because it had a disparate impact on disabled children.  *J.V. on behalf of C.V. v. Albuquerque Pub. Sch.*, No. CV 13-01204 MV/KBM, 2015 WL 13333013, at *6 (D.N.M Mar. 27, 2015).  The court also granted summary judgment because plaintiffs had failed to adduce any evidence that a policy of defendant had caused a disparate impact on disabled children.  *Id.*

When plaintiffs appealed this decision, the Circuit summarized the district court's ruling as one:  determining that plaintiffs waived their disparate impact claim because they had failed to include it in their Complaint and, separately, plaintiff had failed to raise a genuine issue of

material fact about disparate impact. *Albuquerque Pub. Sch.*, 813 F.3d at 1299.  The Circuit

agreed with the district court's decision on both fronts.  *Id.*

In this case, defendants argue that *Albuquerque Public School* means plaintiff waived her

ability to allege intentional discrimination and discrimination by disparate impact by omitting

those claims from the Pretrial Order.  Plaintiff does not respond to this argument directly.

Instead, much like plaintiffs in *Albuquerque Public School*, she argues that the record before the

court is sufficient to establish intentional discrimination through deliberate indifference as well

as discrimination through disparate impact.  In other words, she turns directly to the merits of

those two claims.  But before the court addresses plaintiff's arguments about deliberate

indifference and disparate impact, it must decide the waiver issue.

Before *Albuquerque Public School*, the Tenth Circuit determined that failure to allege

intentional discrimination in the Pretrial Order constitutes waiver of that theory.  *See Tyler v.*

*City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997).  In *Tyler*, after issuing the Pretrial

Order, our court—on its own motion—determined that it had to amend that order under Fed. R.

Civ. P. 16(e) and 39(a)(2).  *Tyler v. City of Manhattan*, 849 F. Supp. 1442, 1443 (D. Kan. 1994).

Plaintiff's Complaint alleged, in three counts, that defendant violated the ADA.  The court

already had granted defendant summary judgment against Count III so two counts remained.

Count II was the focus of the court's analysis.  It alleged that defendant "ha[d] subjected plaintiff

to discrimination by failing to carry out its obligations to permit him to participate equally in its

services, activities, and programs, in particular its recreational programs, city council meetings,

and advisory board activities."  *Id.*  "Under the pretrial order, plaintiff's claims of discrimination

under Count II would be tried to a jury.  In addition, plaintiff claims $50,000 in compensatory

damages for '[m]ental anguish and humiliation, embarrassment and denial of his right of

participation.'"  *Id.  Tyler* conducted an analysis of compensatory damages under Title II of the ADA, which this court will discuss in further detail in subsection 4, below.  For now, it is sufficient to note that *Tyler* concluded "that the ADA does not provide plaintiff a right to a jury trial or to his claimed compensatory damages on Count II" because he had failed to allege intentional discrimination in the Pretrial Order.  *Id.*  At bottom, plaintiff's failure to allege intentional discrimination in the Pretrial Order led the court to strike plaintiff's claim for compensatory damages.  *Id.* at 1445.

On appeal, the Circuit described the district court's determinations in this fashion:  "The district court ruled that compensatory damages for mental and emotional injury were not available under the ADA absent intentional discrimination.  The district court further concluded that [plaintiff] had not claimed he was subjected to intentional discrimination."  *Tyler*, 118 F.3d at 1401.  The Circuit agreed with the district court that the Pretrial Order did not allege intentional discrimination so it affirmed the district court's order striking plaintiff's claim for compensatory damages.  *Id.* at 1404.  In effect, the Tenth Circuit has established that an ADA plaintiff waives an intentional discrimination theory if he fails to assert that theory in the Pretrial Order.

In sum, our Circuit generally has held that if plaintiff fails to allege a theory of discrimination under the ADA in the Complaint or Pretrial Order, whichever is operative, plaintiff waives that theory of liability.

Here, because the court has issued the Pretrial Order, it is the operative document.  Fed. R. Civ. P. 16(d) ("[The Pretrial Order] controls the course of action . . . .");  D. Kan. Rule 16.2(b) ("The pretrial order . . . will control the subsequent course of the action . . . .");  Doc. 56 at 1 ("This pretrial order supersedes all pleadings and controls the subsequent course of this case.").

36

In the Pretrial Order, plaintiff's ADA claims assert that defendants "failed to accommodate" plaintiff in some way.  *Id.* at 9–11 ¶¶ 1–3, 5–7, 9–10.  But she never asserts a claim for intentional discrimination or discrimination by disparate impact.  And in her response to defendants' argument, plaintiff never contends that she did assert discrimination under either of these theories.

The court finds that plaintiff has alleged ADA discrimination based on failure to accommodate, but she has not presented a claim for intentional discrimination or discrimination through disparate impact in the Pretrial Order.  For this reason, the court concludes that plaintiff has waived the opportunity to argue intentional discrimination or discrimination through disparate impact.

### 2.      Intentional Discrimination

Even if plaintiff had not waived these two theories of recovery, she has failed to establish a genuine issue of material fact requiring a trial on either theory.  "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citations omitted).  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood."  *Id.* (internal quotations marks, alteration, and citation omitted).  "The failure to act must be more than negligent and [it must] involve an element of deliberateness."  *Id.* (internal quotation marks and citation omitted).  Here, plaintiff asserts defendants intentionally discriminated against her by failing to provide an ASL interpreter and failing to train their employees.

### a.    Failure to Provide ASL interpreter

Plaintiff first asserts that "from the time the deputies arrived on the scene until the time she was released from jail, she was denied the ability to communicate."  Doc. 72 at 75.  Plaintiff alleges that defendants' employees deprived her this right by failing to provide a sign language interpreter.

Federal regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a)(1).  In pursuit of effective communications, public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  *Id.* § 35.160(b)(1).  Auxiliary aids and services include, "[q]ualified interpreters on-site or through video remote interpreting (VRI) services; . . . written materials; exchange of written notes; . . . text telephones (TTYs) . . . or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing."  *Id.* § 35.104(1).  A qualified interpreter on-site is just one of the options available to public entities.

No bright line rule defines essential steps required to establish effective communication with a hearing-impaired person; instead the inquiry is a fact-specific one.  *See Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1087 (11th Cir. 2007).  "In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication.  In other circumstances, an interpreter will be needed."  *Bircoll*, 480 F.3d at 1087.  At bottom, the quality of communication between a hearing-impaired person and a police officer does not have to be "perfect" to place the hearing-impaired person "on equal footing"

with non-disabled people. *Silva v. Baptist Health S. Florida, Inc.*, 856 F.3d 824, 835 n.7 (11th

Cir. 2017) (citing *Bircoll*, 480 F.3d at 1086).  But the communication technique *must* be

effective.  *Id.* (emphasis added).

Here, plaintiff has failed to establish any facts which could permit a reasonable jury to

find that defendants were deliberately indifferent to a strong likelihood that its policies would

cause ineffective communication.  First, plaintiff fails to identify to any specific policy of

defendants creating such a likelihood.  But more importantly, she fails to establish facts capable

of supporting her bald assertion that "she was denied the ability to communicate."  Doc. 72 at 75.

The summary judgment record shows that during plaintiff's arrest, Corporal Beightel and

Deputy Dobler communicated with plaintiff using a combination of written notes, gestures, and

verbal utterances.  These methods achieve effective communication in many circumstances.  *See*

*Bircoll*, 480 F.3d at 1087.  During screening at the DOC, Officer Hutting used written materials

to complete the intake questions with plaintiff.  To complete the suicide screening, Sergeant

Anderson used a form displayed on a computer screen, and he used written notes.  These

techniques permitted him to learn that plaintiff had been admitted for psychiatric treatment at

Valeo.  These same techniques enabled Sergeant Anderson to identify plaintiff's current

medications.  The methods used by DOC officers constituted the auxiliary aids, or slight

variations of them, identified in 28 C.F.R. § 35.104(1).

Once in her cell, plaintiff communicated effectively with DOC personnel by gesturing

requests for toilet paper and water.  And jail personnel provided her with both items she

requested.  These attempts to communicate show no deliberate indifference to effective

communication.  Instead, they demonstrate attempts by defendants' employees to communicate

effectively with plaintiff.  And although plaintiff claims "she was denied the ability to

communicate," she has failed to come forward with any evidence that she was unable to communicate with defendants' employees.  Defendants' failure to provide a sign language interpreter does not constitute deliberate indifference because defendants' employees effectively used other methods of communication to communicate effectively with plaintiff.  And from these summary judgment facts, no reasonable jury could find that defendants were deliberately indifferent to a strong likelihood that its policies would cause ineffective communication.

Plaintiff next asserts that on September 25, 2015, "[r]ather than provide any accommodation, the Defendants were satisfied with no accommodation."  Doc. 72 at 58.  Again, plaintiff fails to support her argument with any proof of a specific policy of defendants that created a strong likelihood of ineffective communication.  *See Albuquerque Pub. Sch.*, 813 F.3d at 1298.  Also, the summary judgment facts do not show that defendants failed to provide any accommodation.  In fact, they establish the opposite.  Plaintiff contacted and communicated with the 911 dispatcher using a video relay service.  The dispatcher responded, saying she would send a deputy to plaintiff's location.  Plaintiff chose, however, to meet with a deputy at the police station.  Plaintiff offered to use her phone's video relay service once she arrived at the station.  And later in the conversation, the dispatcher confirmed that plaintiff could use the video relay service once she arrived there.  The summary judgment record, even when viewed in plaintiff's favor, does not show that defendants failed to provide an accommodation, much less, that such a failure constituted deliberate indifference by defendants.

### b.    Failure to Train

Plaintiff also contends that "not a single one of the Defendants' employees involved in this case had training on working with the hearing impaired."  Doc. 72 at 58.  "When the alleged failure to act is an alleged failure to train, [the Tenth Circuit] ha[s] required a showing that the

defendant was on notice of the need for more or different training." *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citation omitted).  The Circuit's rule relies on decisions under § 1983 to address failure-to-train ADA claims.  *Id.*  Those decisions require the ADA plaintiff to show "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989)).

In *Albuquerque Public Schools*, the Circuit found that plaintiffs there had failed to show deliberate indifference based on lack of training for three reasons.  Those reasons were a failure to show:  (1) defendant was on notice of the need for more or better training because plaintiffs did not identify a single other incident before the one at issue; (2) defendant's lack of training was more than negligent, *i.e.*, contained an element of deliberateness; and (3) defendant knew that its failure to train made harm to a federally protected right substantially likely.  *Id.*  Because plaintiff had failed to establish any one of these forms of deliberate indifference, the Circuit affirmed the district court's order granting summary judgment against plaintiff's claims.

Here, plaintiff fails to adduce any evidence which could permit a reasonable jury to find deliberate indifference based on a lack of training.  Plaintiff simply asserts that defendants knew they would encounter hearing-impaired citizens, but they pretended like deaf people don't exist.  Trying to support this assertion, plaintiff asserts that defendants had failed to establish a standard method for its employees to work with hearing-impaired citizens.  Instead, defendants' employees used their own individual methods to communicate.  But just like the plaintiffs in *Albuquerque Public Schools*, plaintiff can identify no other incident involving deaf people that preceded her arrest.  Indeed, no such incident has occurred in the last 10 years.  Also, plaintiff

has failed to establish deliberateness, or that defendants knew that a lack of training would lead

to ineffective communication with hearing-impaired individuals.  In sum, plaintiff has failed to

adduce any evidence that would permit her to make a claim for deliberate indifference through

lack of training.

### 3.    Disparate Impact

Plaintiff also alleges that defendants' policies "created a disparate impact on hearing

impaired citizens such as Plaintiff."  Doc. 72 at 57.  "Unlike a claim for disparate treatment, a

claim for disparate impact doesn't require proof of intentional discrimination."  *Albuquerque*

*Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citations omitted).  Instead, to "prove a

case of disparate impact discrimination, the plaintiff must show that a specific policy caused a

significant disparate effect on a protected group."  *Id.* (internal quotation marks and citation

omitted).  "This is generally shown by statistical evidence involving the appropriate comparables

necessary to create a reasonable inference that any disparate effect identified was caused by the

challenged policy and not other causal factors."  *Id.* (internal quotation marks and citation

omitted).  "Moreover, a disparate impact claim must allege a pattern or practice of

discrimination, not merely an isolated instance of it."  *Id.* (citation omitted).

The summary judgment record contains no facts capable of supporting a disparate impact

theory.  Plaintiff's response to this part of defendants' motion simply asserts disparate impact,

but never identifies any admissible evidence that can support her allegation.  This is not

sufficient; saying that something is so is no substitute for admissible evidence.  And so, the court

determines that no reasonable jury could conclude from the summary judgment facts that

defendants' policies created a disparate impact.

In sum, the summary judgment facts present no genuine issue of fact requiring a trial of plaintiff's discrimination claim through deliberate indifference or disparate impact. So even if plaintiff had not waived these theories by omitting them from the Pretrial Order, defendants would be entitled to summary judgment against them.

### 4.       Compensatory Damages

Defendants next argue that plaintiff's omission from the Pretrial Order disposes of another issue. Namely, they argue that plaintiff cannot prevail on a claim for compensatory damages under the ADA without a showing of intentional discrimination. Other circuits explicitly have ruled on this issue. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) ("To prevail on a claim for compensatory damages under either the [Rehabilitation Act] or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." (citations omitted)); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 and Title II [of the ADA] only for intentional discrimination."); *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination." (citation omitted)); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." (citation omitted)).

Our Circuit has not yet decided this issue. But on other ADA issues, it has "look[ed] to decisions construing the Rehabilitation Act to assist [it] in interpreting analogous provisions of the ADA." *See, e.g.*, *Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6. And the Circuit has held,

"To recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the agency's discrimination was intentional." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (citation omitted).  Also, a district court in our Circuit has interpreted one of the Tenth Circuit's decisions "to require a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury [under Title II of the ADA]."  *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1212 (D. Colo. 2010) (citing *Tyler*, 118 F.3d at 1403–04).

          **a.**       *Robertson v. Las Animas County Sheriff's Department*

Plaintiff correctly argues that none of this precedent is binding on the court.  Instead, she asserts, *Robertson v. Las Animas County Sheriff's Department*, 500 F.3d 1185 (10th Cir. 2007) controls the court's decision.  And it stands for the proposition, she argues, that the Tenth Circuit does not require intentional discrimination for a claim for compensatory damages under the ADA to survive summary judgment.

In *Robertson*, a hearing-impaired plaintiff claimed that defendants "violated Title II of the ADA by not providing him with telephone services while he was imprisoned and by not allowing him to participate in his probable cause hearing."  500 F.3d at 1190.  He sought both compensatory and punitive damages based on this claim.  The district court granted summary judgment against plaintiff, concluding:  "[plaintiff] is not a 'qualified individual with a disability' within the meaning of the ADA, and, even if he were, he did not establish that he was denied the benefits of a public entity's services, programs, or activities."  *Id.*

The Circuit reversed.  *Id.* at 1200.  It held that there were genuine issues of material fact. They included a dispute whether plaintiff was disabled within the meaning of the ADA, whether the detention facility knew about plaintiff's disability, and whether the detention facility knew an

accommodation was necessary to enable plaintiff to participate in its services to the same extent as a non-disabled prisoner. *Id.*

Defendants counter plaintiff's reliance on *Robertson*, noting correctly that plaintiff sought declaratory relief and compensatory damages based on his failure to accommodate claim. The court agrees with defendants. *Robertson* presented a different set of claims than plaintiff presents in her case, and that distinction matters. Also, the issue before the Circuit on appeal was whether plaintiff was a qualified individual with a disability within the meaning of the ADA. *Id.* at 1190. *Robertson*'s parties did not contest the question whether compensatory damages required a showing of intentional discrimination.

The court cannot discern, with certainty, whether the Circuit reversed because intentional discrimination is not required to recover compensatory damages (as plaintiff argues) or, instead, because the *Robertson* plaintiff was requesting declaratory judgment (as defendants argue). But, declaratory relief is a separate remedy from compensatory damages, which could have justified the *Robertson* claim surviving summary judgment. *See Tyler*, 849 F. Supp. at 1445 (allowing plaintiff to seek declaratory and injunctive relief under the ADA even though the court struck plaintiff's claim for compensatory relief from the Pretrial Order). The court concludes that the presence of a claim for declaratory relief differentiates *Robertson* from the current case before the court.

### b.     Tenth Circuit interprets ADA claims by borrowing language from § 504

This distinction is significant because several things favor the conclusion that the Tenth Circuit would require a showing of intentional discrimination to support a claim trying to recover damages under Title II of the ADA. First, our Circuit interprets ADA claims by using an approach similar to the one used by other Circuits who expressly have required intentional

discrimination, *i.e.*, borrowing language from § 504 of the Rehabilitation Act.  The First Circuit

described how it concluded that compensatory damages are available under Title II of the ADA

but only for intentional discrimination:

> *Alexander v. Sandoval*, 532 U.S. 275 (2001), holds that compensatory damages
> are available under Title VI only for intentional discrimination.  *Id.* at 280–81
> (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983)).  Section
> 504 of the Rehabilitation Act and Title II of the ADA borrow their remedies from
> Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.  See* 42 U.S.C.
> § 12133 (Title II of the ADA borrows remedies from the Rehabilitation Act); 29
> U.S.C. § 794a(a)(2) (Rehabilitation Act borrows remedies from Title VI).

*Nieves-Marquez*, 353 F.3d at 127 n.20.

When the Ninth Circuit reached the same conclusion two years earlier, it also began with

Title VI, reasoning that "Title II and § 504 are expressly linked to Title VI."  *Ferguson v. City of

Phoenix*, 157 F.3d 668, 673–74 (9th Cir. 1998).  At that time, the Ninth Circuit didn't have the

benefit of *Alexander*'s holding so it relied on *Guardians*.  In doing so, it reached the same

conclusion as the First Circuit—"compensatory damages are not available under Title II or § 504

absent a showing of discriminatory intent."  *Id.* at 674.  The Fifth Circuit reached the same

conclusion for the same reasons.  *See Delano–Pyle*, 302 F.3d at 574; *see also Carter v. Orleans

Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984).

Plaintiff tries to rebut these holdings by citing a law review article that asserts that courts

should not impose intent requirements on claims under Title II and § 504.  *See* Mark C.

Weber, *Accidentally on Purpose:  Intent in Disability Discrimination Law*, 56 B.C. L. Rev. 1417

(2015).  The article's author submits that courts have paid "insufficient attention to *Alexander v.

Choate*, [469 U.S. 287 (1985),] *Alexander v. Sandoval*, *Barnes v. Gorman*, [536 U.S. 181

(2002),] statutory text and legislative history, and the policy considerations."  *Id.* at 1464.

"[R]ather than reflexively dismissing cases for lack of proof," he asserts, "courts must engage in

46

the hard task of determining whether reasonable accommodations have been denied and what relief is appropriate." *Id.*

Although the article makes some well-reasoned arguments, the court does not find its conclusion persuasive. Plaintiff has provided nothing to suggest that courts have adopted the article's proposition, or that the Supreme Court believes lower courts are misapplying its earlier opinions. Indeed, the Supreme Court has had at least two opportunities to redirect the law if it believed that redirection was necessary. Both times, it declined to do so. *See Delano–Pyle v. Victoria Cty.*, 302 F.3d 567, *cert. denied*, 540 U.S. 810 (2003); *Ferguson v. City of Phoenix*, 157 F.3d 668, *cert. denied*, 526 U.S. 1159 (1999). The court thus finds no reason to dispense the intent requirement that other Circuits have applied.

As discussed, the Tenth Circuit uses decisions under the Rehabilitation Act to interpret the ADA. *See Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6. This is the approach used by other Circuits who have concluded that compensatory damages are available under Title II of the ADA but only for intentional discrimination claims. In a recent decision affirming this approach, the Tenth Circuit cited a Ninth Circuit case that expressly required a plaintiff to prove intentional discrimination to recover monetary damages under Title II of the ADA. *Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6 (citing *Duvall*, 260 F.3d at 1138).

### c.      *Tyler v. City of Manhattan*

Although our Circuit has not addressed this issue squarely, it has come close. In 1994, this court held that compensatory damages for mental and emotional injury were not available under Title II of the ADA without a showing of intentional discrimination. *Tyler*, 849 F. Supp. at 1443. After the court found that plaintiff had not alleged intentional discrimination in the Pretrial Order, it struck plaintiff's compensatory damages claim. *Id.* at 1245. Plaintiff appealed.

On appeal, plaintiff argued that he was subjected to intentional discrimination.  *Tyler*, 118 F.3d 1400 at 1401.  But he never contended that Title II of the ADA does not require intentional discrimination to support a claim for compensatory damages.  Instead, the United States raised this issue *amicus curiae*.  *Id.* at 1403.  The Circuit, exercising its discretion, elected not to address the government's argument.  *Id.* at 1404.  Instead, the court found that the Pretrial Order did not allege intentional discretion and affirmed the district court's decision.  *Id.*

The District of Colorado court has interpreted the Circuit's affirmation "to require a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury [under Title II of the ADA]."  *Ulibarri*, 742 F. Supp. 2d at 1212 (citing *Tyler*, 118 F.3d at 1403–04).  While the court does not agree that our Circuit has resolved this question explicitly, it does agree that the outcome in *Tyler* signals an approval—albeit implicitly—of our court's holding in *Tyler* that compensatory damages for mental and emotional injury were not available under Title II of the ADA without intentional discrimination.

Taken together, these factors persuade the court to predict that our Circuit—if presented with the issue—would require intentional discrimination to recover compensatory damages under Title II of the ADA.  Because the summary judgment facts present no basis to sustain a claim for intentional discrimination, defendants are entitled to summary judgment on plaintiff's compensatory damages claims under the ADA.  Because plaintiff seeks no other remedy under the ADA, Doc. 56 at 13 (requesting compensatory damages as relief for ADA claim but no other type of damages), defendants are entitled to summary judgment against all plaintiff's ADA claims.

### C.     Kansas State Law Claims

Last, plaintiff alleges that defendants committed various torts recognized by Kansas state law.  In short form, she claims that defendants' employees falsely arrested her and inflicted emotional distress on her, and defendants, themselves, negligently trained and supervised their employees.  Doc. 56 at 11–12 ¶¶ 11–13.  The following three subsections address these tort claims.

### 1.     False Arrest

Plaintiff's first state law claim relies on the tort known as false arrest or, sometimes, false imprisonment.  "'False arrest' is the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being restrained fears to disregard." *Soto v. City of Bonner Springs*, 166 P.3d 1056, 1059 (Kan. Ct. App. 2007).  Defendants argue they are entitled to summary judgment against this claim for two distinct reasons.

*First*, defendants say, the claim fails as a matter of law because defendants' officers had probable cause to arrest plaintiff for domestic battery.  "To prevail on [a] false arrest and imprisonment claim, [plaintiff] is required to prove [that she] was intentionally restrained, confined, or arrested without justification or legal excuse." *Spillman v. Stanton*, 335 P.3d 710, 2014 WL 4996185, at *3 (Kan. Ct. App. Oct. 3, 2014) (citing *Thompson v. Gen. Fin. Co.*, 468 P.2d 269, 279–80 (Kan. 1970)).  Kansas law permits a law enforcement officer to arrest a person—and thus legally justifies the restraint, confinement, or arrest of that person for purposes of a false arrest claim—if the officer had probable cause to believe that the person is committing or has committed a misdemeanor.  *Id.*; *see* Kan. Stat. Ann. § 22-2401(c)(2); *see also Mendoza v.*

49

*Reno Cty.*, 681 P.2d 676, 678 (Kan. 1984).  Kansas law recognizes domestic battery as a class B

person misdemeanor.  Kan. Stat. Ann. § 21-5414(c)(1)(A).

No dispute exists about some aspects of this claim.  For example, everyone agrees that

officers intentionally arrested plaintiff.  That much is undisputed.  So summary judgment turns

on whether they had legal justification to arrest plaintiff.  The court already has concluded that

no reasonable jury could find that defendants' officers lacked probable cause to arrest plaintiff

for domestic battery.  Under Kansas law, an officer has legal justification to arrest a person for a

misdemeanor if he has probable cause to believe that person has committed a misdemeanor.  *See*

*Spillman*, 2014 WL 4996185, at *3; Kan. Stat. Ann. §§ 22-2401(c)(2) & 21-5414(c)(1)(A).

Given the court's earlier conclusion that probable cause existed, the court now concludes that no

reasonable jury could find that defendants' officers lacked legal justification to arrest plaintiff.

This conclusion excludes any possibility that plaintiff could establish an essential element of her

claim and thus makes summary judgment proper.

*Second*, defendants argue that the "enforcement of law" exception in the Kansas Tort

Claims Act ("KTCA") protects them from liability.  This exception in the KTCA provides, "A

governmental entity or an employee acting within the scope of the employee's employment shall

not be liable for damages resulting from . . . enforcement of or failure to enforce a law, whether

valid or invalid, including but not limited to, any statute, rule and regulation, ordinance or

resolution."  Kan. Stat. Ann. § 75-6104(c).  Naturally, "[i]f the actions of a government entity or

employee are outside the purview of the statute, regulation, ordinance or resolution, however, the

exception contained in 75-6104(c) is inapplicable."  *Allen v. Bd. of Comm'rs of Cty. of*

*Wyandotte*, 773 F. Supp. 1442, 1455 (D. Kan. 1991) (citation omitted).

In *Allen*, our court granted summary judgment against false and negligent imprisonment claims based on the KTCA's "enforcement of law" exception. *Id.* at 1455. In that case, the court found that defendants had arrested plaintiff for violating Kansas law by driving on a suspended license. The court determined that there was no evidence capable of supporting a finding that defendants acted outside the scope or purview of Kansas law. So, the court concluded, defendants were acting to enforce state law and thus granted summary judgment against the false imprisonment claim. *Id.*

Based on the conclusions the court already has reached on the summary judgment motion, the court holds the summary judgment facts establish that defendants' officers were enforcing the Kansas state law criminalizing domestic battery when they arrested plaintiff. Because she has adduced no admissible evidence suggesting a genuine issue of material fact exists, defendants' officers, as a matter of law, did not act outside the scope of Kansas law. So, they qualify for the "enforcement of law" exception to the KTCA. This determination provides a second reason to grant defendants summary judgment against this claim.

### 2.    Tort of Outrage

Next, plaintiff claims that "Defendants' employees inflicted emotional distress on Plaintiff in violation of Kansas tort law." Doc. 56 at 12 ¶ 13. Kansas law commonly calls this claim the tort of outrage. *See Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010) ("In Kansas, the tort of outrage is the same as the tort of intentional infliction of emotional distress."). To prevail on this claim, a plaintiff must prove four elements: (1) the defendants' conduct "was intentional or in reckless disregard of the plaintiff;" (2) the conduct was "extreme and outrageous;" (3) a causal connection exists between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was "extreme and severe." *Id.* "It is only

where the distress is 'extreme' or 'severe' that liability arises." *Id.* at 395.  Defendants are

entitled to summary judgment against this claim for two reasons.

*First*, this claim relies on vicarious liability to try to attach the deputies' conduct plaintiff

complains about to the two defendants she has sued.  Plaintiff's response to the summary

judgment motion concedes as much.  *See, e.g.*, Doc. 72 at 64 ("There is no question [plaintiff]

meets all of the requirements necessary to assert a claim against [Shawnee] County and its

employees for the outrageous conduct *of the deputies* in arresting, detaining and jailing her, as

the victim." (emphasis added)).  This assertion replicates the vicarious liability used by the

plaintiff in *Bolden v. PRC, Inc.*, 43 F.3d 545 (10th Cir. 1994).

In that case, the plaintiff sued his employer and his "immediate supervisor" for

outrageous behavior allegedly imposed on by his co-workers.  *See Bolden*, 43 F.3d at 553; *see

also id.* at 548 (identifying Mr. Carver as plaintiff's "immediate supervisor").  The district court

granted summary judgment against the claim and the Tenth Circuit affirmed.  The Circuit

explained the key to its reasoning in this fashion:  plaintiff "has failed to bring to this court's

attention any Kansas tort of outrage case in which any employer was held liable for the

outrageous conduct of an employee." *Bolden*, 43 F.3d at 554.

The plaintiff's claim here suffers the same problem.  She never asserts that the case's two

defendants—the Board of County Commissioners for Shawnee County, Kansas and the Sheriff

of the County—did something outrageous themselves.  *See* Doc. 72 at 64 (suing for "outrageous

conduct of deputies"); *see also* Doc. 56 (Pretrial Order) at 1 (identifying neither Deputy Sheriff

as a defendant).  In short, plaintiff's case aligns with the outrage claim rejected by *Bolden*.  And

like the *Bolden* plaintiff, plaintiff here "has failed to bring to this court's attention any Kansas

tort of outrage case" where an employer or a supervisor "was held liable for the outrageous

conduct of an employee." *See Bolden*, 43 F.3d at 554. The court thus concludes it should impose the same outcome as *Bolden*—summary judgment.

*Second*, even if plaintiff had established that defendants could be vicariously liable for their employees' conduct, she also has failed to adduce any evidence capable of supporting a finding of extreme and outrageous conduct. For "[c]onduct to be a sufficient basis for an action to recover for emotional distress [it] must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981). "[M]ere insults, indignities, threats, annoyances, petty expressions, or other trivialities" are not enough. *Id.*

Plaintiff utterly defaults on her obligation to adduce evidence of such conduct. Her response to the summary judgment never identifies admissible evidence of conduct that exceeded "the bounds of decency and is utterly intolerable in a civilized society." *See id.* She tries to discharge her burden with argument—calling the deputies' conduct "abhorrent and extreme." Doc. 72 at 64. Spirited rhetoric is no substitute for admissible evidence of facts.

Our Circuit has explained the kind of behavior that can satisfy this qualitative element of Kansas law. It noted that the Kansas Court of Appeals had affirmed a plaintiff's verdict on an outrage claim in a case where "the employer" had "subjected the employee to vulgar, racist expressions and threats of violence" that "result[ed] in possibl[y] serious medical problems." *Bolden*, 43 F.3d at 554 (describing *Gomez v. Hug*, 645 P.2d 916 (Kan. Ct. App. 1982)). The Circuit also referenced *Laughinghouse v. Risser*, 754 F. Supp. 836 (D. Kan. 1990), a case where this court denied summary judgment against an outrage claim. In that case, the defendant—the plaintiff's supervisor—had engaged in "a concerted effort to terrorize [plaintiff] and to intentionally break her spirit." *Laughinghouse*, 754 F. Supp. at 843. The court reasoned that the

nature of the abuse and its "constancy" provided a basis capable of supporting a jury finding for

plaintiff. *Id.* at 844.

The summary judgment facts here fall far short of either *Gomez* or *Laughinghouse*.

Plaintiff asserts that two deputies arrested her and placed her in custody without adequate

probable cause. Even if this were so—and the court has concluded it is not—this is not the kind

of conduct that can support a Kansas outrage claim. The court grants summary judgment against

the claim for this additional reason.

### 3.   Negligent Training and Negligent Supervision

Finally, plaintiff alleges that both defendants are liable for negligent training and

supervision.[8] "A claim based on negligent training depends upon establishing facts showing that

more or better training would have prevented the harm." *Estate of Belden v. Brown Cty.*, 261

P.3d 943, 968 (Kan. 2011).

Initially, defendants' argument for summary judgment against the negligent training

claim is a simple one: "[Plaintiff] has not explained what additional training should have been

provided and how it would have made any difference in this case." Doc. 65 at 45. Plaintiff

responds, claiming that "any" training could have prevented her wrongful arrest. Doc. 72 at 60.

She notes that both Corporal Beightel and Deputy Dobler had received no training about working

---

[8]   Defendants claim it is difficult to ascertain the gravamen of plaintiff's negligence claim. Doc. 65 at
43. But they interpret plaintiff's allegations to assert three theories of liability. One of those theories is a
combination of negligent training and negligent supervision. Defendants then make summary judgment
arguments against all three theories they apprehend in the Pretrial Order. Doc. 65 at 43–45. In her
Opposition to the summary judgment motion—Doc. 72—plaintiff responds only to defendants'
arguments attacking the negligent training and negligent supervision theory. Doc. 72 at 62–64. From this
confusing set of circumstances, the court concludes that plaintiff only makes a negligent training and
supervision claim. And even if she had asserted the two other theories, she has abandoned them by not
responding to defendants' summary judgment arguments on them. *See Hinsdale v. City of Liberal, Kan.*,
19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's ruling that plaintiff abandoned claim
by failing to address it in response to motion for summary judgment); *see also Maestas v. Segura*, 416
F.3d 1182, 1190 n.9 (10th Cir. 2005) (finding plaintiffs abandoned claims by failing to "seriously
address" them in their appellate brief).

with hearing-impaired individuals.  She argues that any training would have better prepared the officers to handle the challenges of communicating with a hearing-impaired citizen.  *Id.* at 62.  Plaintiff also asserts that defendants knew or should have known that they were setting their deputies and corrections officers up to fail by not providing them any ADA training or training on hearing-impaired citizens.  *Id.*  And although the precise nature of the harm need not be foreseeable, plaintiff contends, her harms were foreseeable to defendants.  *See id.* at 62–63 (citing *Kansas State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 598 (Kan. 1991) (finding that for an employer to be liable on a negligent supervision claim, it is not necessary that the employer should have foreseen the precise nature of the injury alleged by plaintiff)).

Defendants reply, arguing that no amount of training would have produced a different outcome here.  They contend that they had no obligation to provide a sign language interpreter.  And even if they had provided an interpreter skilled in ASL, plaintiff has not demonstrated how it would have changed the facts that led to the probable cause determination, her arrest, or the reasonableness of placing her on suicide watch.  While plaintiff responds that any training on the ADA or hearing-impaired citizens could have prevented her harm, she fails to adduce any evidence providing a basis for a jury finding that what she argues is so.  She also fails to define the harm she allegedly faced.

Rather than speculate about plaintiff's claims, the court decides the claims plaintiff actually has made.  The most obvious alleged harms are the torts—false arrest and outrage.  The court already has determined that the summary judgment facts present no basis for the jury to find that defendants caused plaintiff either of these harms.  In the words of the Kansas Supreme

55

Court, she has failed to marshal any evidence of "facts showing that more or better training would have prevented the harm." *Estate of Belden*, 261 P.3d at 968.

Plaintiff also has failed to produce admissible evidence that defendants had reason to believe their employees were not properly trained.  "In order to state a claim of negligent training, however, plaintiff must establish that [defendants] had a reason to believe that [their] employees were not properly trained." *Keeler v. Aramark*, No. CV 09-1356-MLB, 2010 WL 11570205, at *3 (D. Kan. Aug. 12, 2010) (citing *Thomas v. Cty. Comm'rs of Shawnee Cty.*, 198 P.3d 182, 193 (Kan. Ct. App. 2008)) (granting summary judgment against claim).  Plaintiff has come forward with no facts showing that defendants knew their employees lacked proper training.  Indeed, the only evidence in the summary judgment record that informs this issue favors the opposite conclusion:  the undisputed facts establish that defendants had not received any complaints for failing to accommodate a disabled person in the 10 years before plaintiff's arrest.  By presenting no evidence to create a triable issue of fact, plaintiff has failed to establish defendants had reason to believe their employees were not properly trained.

In sum, plaintiff has failed to identify the particular harms she faced and how training could have prevented those alleged harms.  She also has failed to adduce admissible evidence that defendants had reason to believe their employees were not properly trained.  For these reasons, the court grants defendants summary judgment against plaintiff's negligent training claim.

This leaves plaintiff's negligent supervision theory.  To be sure, Kansas law recognizes this cause of action.  As the state's court of appeals has explained, negligent supervision "entails either inadequate oversight and review of an employee in the performance of [the employee's]

job duties or failing to control an employee with propensities that might pose a danger." *Estate of Belden*, 261 P.3d at 968.

Here, the second half of this formulation is easily dispatched. Plaintiff has identified no admissible evidence that Corporal Beightel or Deputy Dobler presented propensities that might pose a danger to plaintiff. The same deficiency exists for the other employees criticized by plaintiff's summary judgment Opposition. In short, she has failed her summary judgment burden to substantiate this form of a negligent supervision claim.

Plaintiff's summary judgment response is equally deficient under the first half of *Belden*'s formulation. This form of negligent supervision requires plaintiff to adduce admissible evidence that defendants provided "inadequate oversight and review" of an employee in the performance of the employee's job duties. *Belden* explains how a plaintiff might shoulder this burden: "[P]olicies and procedures falling below accepted practices in an industry or otherwise failing to conform to standards of reasonable care may create tort liability." 261 P.3d at 969 (citing *Dye v. WMC, Inc.*, 172 P.3d 49 (Kan. Ct. App. 2007)).

The *Belden* plaintiff tried to marshal such evidence. It retained an expert who gave an affidavit opining about certain subjects relevant to the jail setting at issue in that case. And while the court of appeals ultimately concluded the expert's opinions were inadequate[9] to forestall summary judgment, at least those opinions constituted some evidence.

Plaintiff here has done far less. She has not presented an affidavit or expert report opining that defendants' policies or procedures "fall[] below accepted practices" in the law enforcement industry, or "otherwise fail[] to conform to standards of reasonable care." *Id.* To say it directly, she offers even less to carry her burden than the unsuccessful *Belden* plaintiff

---

[9]   The affidavit proved inadequate, the Kansas court concluded, because it merely used legal terminology and offered no more than "conclusory" opinions. *Belden*, 261 P.3d at 969.

offered.  Instead, her summary judgment response relies solely on her lawyer's argument.  As

*Belden* makes clear, this tactic will not suffice.

In sum, the summary judgment record here is more deficient than in *Belden*.  For that

reason, the court concludes that this plaintiff's negligent supervision claim must conclude in the

same way the same claim concluded in *Belden*:  with entry of summary judgment.

**IV.    Conclusion**

In sum, the court grants defendants summary judgment against all plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for

Summary Judgment (Doc. 64) is granted.

**IT IS SO ORDERED.**

**Dated this 5th day of April, 2018, at Topeka, Kansas.**

                                **s/ Daniel D. Crabtree_____**
                                **Daniel D. Crabtree**
                                **United States District Judge**

58

**ATTACHMENT B**

Judgment in a Civil Action (Doc 80)

AO 450 (Rev. 01/09)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## District of Kansas

| | |
|---|---|
| CAROLYN HANS,<br>*Plaintiff(s)*<br>v.<br>BOARD OF SHAWNEE COUNTY COMMISSIONERS<br>and HERMAN T. JONES,<br>*Defendant(s)* | )<br>)<br>)<br>)<br>) |

Civil Action No.  16-4117-DDC

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ %, per annum, along with costs.

☑ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* Board of Shawnee County Commissioners and _____ recover costs from the plaintiff *(name)* Carolyn Hans _____ .

☐ other:  (defendants' names continued from above):  Herman T. Jones

.

This action was *(check one)*:

☐ tried by a jury with _____ presiding, and the jury has rendered a verdict.

☐ tried by _____ without a jury and the above decision was reached.

☑ decided by  District Judge Daniel D. Crabtree _____ on a motion for summary judgment (Doc. 64).

Date:  04/05/2018

*TIMOTHY M. O'BRIEN*
*CLERK OF COURT*

s/ Megan Garrett
*Signature of Clerk or Deputy Clerk*